[No. D046348. Fourth Dist., Div. One. Dec. 2, 2005.]

ROBERT C. FRIESE, as Trustee, etc., Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
JOHN J. MOORES et al., Real Parties in Interest.

## COUNSEL

Mazzarella, Dunwoody & Caldarelli, Mark C. Mazzarella, Marisa Janine-Page; Yetter & Warden and R. Paul Yetter for Petitioner.

Bill Lockyer, Attorney General, Thomas Greene, Chief Assistant Attorney General, Mark J. Breckler, Assistant Attorney General, and Jeffrey A. Rich, Deputy Attorney General, as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Leck & Associates and Robert Burns Leck for California Manufacturers & Technology as Amicus Curiae on behalf of Respondent.

Allan S. Zaremberg for California Chamber of Commerce and California Business Roundtable as Amicus Curiae on behalf of Respondent.

Post, Kirby, Noonan & Sweat, David J. Noonan; Niddrie, Fish & Buchanan, David A. Niddrie; Quinn, Emanuel, Urquhart, Oliver & Hedges, John B. Quinn, Kathleen M. Sullivan and Harry A. Olivar, Jr., for Real Parties in Interest John J. Moores and JMI Services, Inc.

Bewley, Lassleben & Miller and Leighton M. Anderson for Real Party in Interest Christopher A. Cole.

Hahn & Adema, Jane Hahn, Alison P. Adema; Goodwin Procter, Christine S. Chung and Brian E. Pastuszenski for Real Parties in Interest Norris Van Den Berg and Charles E. Noell.

Duckor, Spradling & Metzger, Michael Duckor and Robert M. Shaughnessy for Real Party in Interest Rod Dammeyer.

Bergeson, Daniel J. Bergeson, Stephen D. Rockwell, Caroline McIntyre and Derek H. Lim for Real Party in Interest Stephen P. Gardner.

Goodin, MacBride, Squeri, Ritchie & Day, Wayne Travers Lamprey, Anne H. Hartman and Glenn M. Goffin for Real Party in Interest Thomas G. Watrous.

Vance, Blair & Grady and Thomas L. Vance for Real Party in Interest Matthew C. Gless.

McKenna, Long & Aldridge, Robert S. Brewer, Jr., and Christian D. Humphreys for Real Party in Interest Richard T. Nelson.

Paul, Hastings, Janofsky & Walker and Christopher H. McGrath for Real Party in Interest Frederic B. Luddy.

.

## Opinion

**BENKE, Acting P. J.**—Corporations Code[1] sections 25402 and 25502.5 are part of the Corporate Securities Law of 1968. (§ 25000 et seq.) In general, section 25402 prohibits so-called insider trading by the issuer of securities or by any person who is an officer, director or controlling person of an issuer. Until 1988 only purchasers or sellers of stock who could show that they had been harmed by virtue of insider trading had a right of action against violators of section 25402. In 1988 the Legislature added section 25502.5, which allows the issuer or anyone acting in the name of the issuer to recover from an officer, director or controlling person who has violated section 25402 up to three times the amount such a violator earned by virtue of his or her insider trading. Section 25502.5 is a disgorgement statute and the issuer does not need to show that it was harmed by the activities of the inside trader.

Section 25402 governs only securities transactions which occur in this state. Moreover, only issuers who have more than $1 million in assets and more than 500 shareholders may bring an action under section 25502.5. However, aside from those geographic and capitalization requirements, there are no other express limitations on the scope of either statute. In particular, nothing on the face of either statute limits application of the statutes to securities issued by domestic corporations.

Section 2116, which is not a part of the Corporate Securities Law of 1968, provides that a director's liability to a corporation is a matter of internal governance of the corporation and is governed by the laws of the state in which it is incorporated.

Here, plaintiff is the successor in interest to a Delaware corporation, which has its headquarters and principal place of business in California and does substantial business here. Defendants are a group of former officers and directors of the corporation. Plaintiff alleges that defendants violated section 25402 and are liable under section 25502.5 to plaintiff for up to three times the amount defendants earned by way of their insider trading. Defendants argue that because the issuer was a Delaware corporation and

---

[1] All further statutory references are to the Corporations Code unless otherwise indicated.

Delaware has no statute analogous to section 25502.5, the internal affairs doctrine as codified in section 2116 prevents defendants from being held liable under section 25502.5. The trial court agreed and sustained defendants' demurrers to plaintiff's insider trading causes of action without leave to amend.

We issued an order to show cause on plaintiff's petition for a writ of mandate. For the reasons we set forth below we grant the petition. Unlike the trial court, we do not believe section 2116's provisions concerning internal corporate governance modify or limit any provision of the Corporate Securities Law of 1968, including in particular section 25502.5. Briefly, while we agree that the duties officers and directors owe a corporation are in the first instance defined by the law of the state of incorporation, such duties are not the subject of California's corporate securities laws in general or section 25502.5 in particular. California's corporate securities laws are designed to protect participants in California's securities marketplace and deter unlawful conduct which takes place here. Because a substantial portion of California's marketplace includes transactions involving securities issued by foreign corporations, the corporate securities laws have been consistently applied to such transactions. There is nothing on the face of section 25502.5 or in its history which suggests that the Legislature intended that it have any narrower scope than other parts of the Corporate Securities Law of 1968.

## SUMMARY

Plaintiff and petitioner Robert C. Friese (the trustee) is the successor trustee of the Peregrine Litigation Trust, which itself is successor in interest to and acting in the name and right of the Estate of Peregrine Systems, Inc. Defendants and real parties in interest (defendants) are former directors and former senior management[2] of Peregrine Systems, Inc. (Peregrine), a

---

[2] John J. Moores served as a director of Peregrine from March 1989 to March 2003 and as chairman of the board from March 1990 through July 2000 and from May 2002 through March 2003. Christopher A. Cole served as president and chief executive officer of Peregrine from 1986 to 1989 and as a director from 1980 to March 2003. Charles E. Noell III served as a director from January 1992 to March 2003. Stephen P. Gardner served as chief executive officer, president and a director from April 1998 to May 2002. Matthew C. Gless served as vice-president of finance, and chief accountant from November 1999 to November 2000 and as chief financial officer and a director from November 2000 to May 2002. Richard T. Nelson served as general counsel, corporate secretary, vice-president of corporate development, senior vice-president of IMG operations, general manager of the Xanadu division, acting chief executive officer and a director during various periods from November 1995 to June 2002. Norris van den Berg served as a director from January 1992 to October 2000. Thomas G. Watrous served as a director from 1999 to 2003, and was appointed to the audit committee in 2001. Douglas S. Powanda served as a vice-president of worldwide sales, and executive vice-president of worldwide operations from January 1998 to July 2001. Frederic B. Luddy served as a vice-president of research and development and chief technology officer from July

software manufacturer. Peregrine is a publicly traded Delaware corporation and, as we noted, its headquarters and principal place of business are in San Diego.

According to the allegations of the trustee's complaint, the following circumstances support its claims: In 1997, Peregrine issued its initial public offering (IPO) and its stock was valued at $2.75 per share. Before the IPO, Peregrine's revenue derived mostly from direct sales to end customers. After the IPO, the board of directors implemented a plan to increase revenue by expanding indirect sales to intermediaries who would then resell Peregrine's products to consumers.

In addition to its new sales strategy, Peregrine implemented a new accounting technique. Prior to the IPO, Peregrine employed what is known as the "sell-through" accounting method under which Peregrine recorded revenue when a product was sold to an end user. Following the IPO, Peregrine adopted what is known as the "sell-in" accounting method under which revenue is recorded when a product enters the distribution stream. Peregrine's board of directors adopted the "sell-in" method notwithstanding an admonition from its chief financial officer that this was not a preferred method of recording revenue.

In Peregrine's 1999 public announcements and Securities and Exchange Commission filings, Peregrine failed to note that it had adopted the "sell-in" method of recording revenue and that without the new accounting method it would not have met earlier revenue expectations. In fact in 1999 Peregrine posted $138.1 million in revenues, a 123 percent increase over 1998.[3] The increase was largely due to the use of the more aggressive "sell-in" accounting method.

Between April 29, 1999, and August 31, 1999, defendants collectively sold more than 5,200,000 Peregrine shares and received approximately $129 million in proceeds from the stock sales.

In 2000 Peregrine posted revenues of $253.3 million, an increase of 83 percent over the previous year, and the price of its common stock reached an all time high of $79.50 per share. As reported revenues soared, defendants failed to disclose that indirect sales were exceeding the 25 percent maximum set by Peregrine's auditors, that intermediaries were unable to sell inventory

---

1997 through August 2003. Trusts controlled by real parties were also named as defendants in the complaint filed in superior court.

[3] Peregrine's fiscal year ends March 31. The 1999 report covered revenues from April 1, 1998, to March 31, 1999.

Peregrine had already recorded as revenue, that direct sales were exceedingly low, and that Peregrine was negotiating a merger defendants knew would likely be negatively received by investors.

Between February 7, 2001, and February 28, 2001, defendants sold over 5,000,000 shares of Peregrine common stock and received in excess of $170 million from the sales. Peregrine posted profits of $564.7 million for 2001, an increase of 123 percent over 2000. Defendants again failed to disclose Peregrine's weak direct sales and reliance on indirect sales.

In May 2002, after Peregrine announced an internal investigation into potential accounting irregularities and the resignation of its chief executive officer, the price of Peregrine's stock dropped to 89 cents per share, which was 87 percent lower than it had been on April 30, 2002. In September 2002 Peregrine initiated bankruptcy proceedings. During these proceedings, Peregrine cancelled its previously issued common stock, costing shareholders about $4 billion in equity. A restatement of its revenue revealed that Peregrine overstated its profits by more than $500 million, or 38 percent, between April 1999 and December 2001.

On February 24, 2004, the trustee filed a complaint in superior court, alleging violations of California insider trading laws,[4] breach of the fiduciary duty of loyalty, breach of the fiduciary duty of care,[5] waste of corporate assets, conspiracy and unjust enrichment. On April 1, 2005, the trial court sustained defendants' demurrers to the trustee's insider trading violations without leave to amend. The trial court found that section 2116 and the internal affairs doctrine preclude application of section 25502.5 to the securities defendants sold. The trustee was given leave to amend his remaining causes of action.

On May 3, 2005, the trustee filed a petition for writ of mandate with this court, challenging the trial court's order sustaining the demurrer. We issued an order to show cause.

---

[4] Specifically, the trustee alleged defendants violated section 25402 by selling and transferring Peregrine shares while in possession of material, adverse, nonpublic information. The trustee also alleged Moores and Noell violated section 25403, subdivision (a), by controlling and inducing the sale of company stock, in violation of the Corporations Code. (§§ 25402, 25403, subd. (a).)

[5] Alleged against defendants and Richard A. Hosley II, William D. Savoy and Rodney F. Dammeyer. Richard A. Hosley II served as a director from 1992 through 2000. William D. Savoy served as a director from June 2000 to November 2002. Rodney F. Dammeyer served as a director from October 2001 through May 2002.

## DISCUSSION

### I

### *Writ Relief*

Writ relief is appropriate here because this case raises an important issue of statutory construction which has not yet been confronted by either this court or our Supreme Court. We also note that, although the trustee was given leave to amend some of his causes of action, it would be wasteful to compel him to fully litigate those claims in the trial court before obtaining a definitive ruling on his insider trading claims. Under these circumstances extraordinary relief is appropriate. (See *Barrett v. Superior Court* (1990) 222 Cal.App.3d 1176, 1183 [272 Cal.Rptr. 304].)

### II

### *Application of California Securities Laws to Foreign Corporations*

For the last 100 years California's corporate securities laws have been applied to foreign corporations who do business in this state or whose activities in this state have an impact on this state's securities markets. In *Williams v. Gaylord* (1902) 186 U.S. 157 [46 L.Ed. 1102, 22 S.Ct. 798] the Supreme Court was asked to consider application of an 1880 California law which governed mining corporations. The 1880 act provided as follows: " 'Sec. 1. It shall not be lawful for the directors of any mining corporation to sell, lease, . . . or otherwise dispose of the whole or any part of the mining ground owned or held by such corporation, nor to purchase or obtain, in any way, any additional mining ground, unless such act be ratified by the holders of at least two thirds of the capital stock of such corporation. Such ratification may be made either in writing, signed and acknowledged by such stockholders, or by resolution, duly passed at a stockholders' meeting called for that purpose.' " (*Id.* at p. 158.) In *Williams v. Gaylord* a West Virginia mining corporation owned mining ground in California. The plaintiff obtained a mortgage on the corporation's mining ground but did not obtain the necessary shareholder consent. The mortgage secured $50,000 in bonds issued by the corporation. Later, the supplier of materials and labor filed and foreclosed on a mechanics' lien on the same property. The holder of the mechanics' lien argued that the mortgage was unenforceable because the corporation's shareholders had not ratified it. The circuit court and Court of Appeals agreed with the holder of the mechanics' lien. On certiorari the Supreme Court affirmed. The court noted that the California Supreme Court

had previously held that the 1880 act applied to foreign corporations. The court then rejected the mortgage holder's contention that the statute improperly intruded upon the internal affairs of a foreign corporation. The court stated: "[W]hen a corporation sells or encumbers its property, incurs debts *or gives securities, it does business, and a statute regulating such transactions does not regulate the internal affairs of the corporation.*" (*Williams v. Gaylord, supra,* 186 U.S. at p. 165, italics added.)

The scope of California's securities regulation was considered again in *Western Air Lines, Inc. v. Sobieski* (1961) 191 Cal.App.2d 399 [12 Cal.Rptr. 719] (*Sobieski*). In *Sobieski* the management of a Delaware corporation, which had its headquarters and principal place of business in this state, was engaged in a dispute with minority shareholders. In an effort to frustrate the minority shareholders' ability to elect directors, the management proposed that the corporation amend its Delaware articles of incorporation to eliminate cumulative voting. The California Commissioner of Corporations determined that any solicitation of proxies approving the elimination of cumulative voting was a sale of securities within the meaning of the Corporations Code and would require a permit from the commissioner. Thereafter, the commissioner denied the corporation's application for a permit. By way of a writ of mandate, the corporation challenged the commissioner's assertion of authority over its attempt to amend its articles. The trial court granted the writ and found, among other matters, that the amendment of the articles of incorporation was an internal affair of the corporation and its shareholders. (*Sobieski, supra,* 191 Cal.App.2d at p. 405.) The Court of Appeal reversed. In rejecting application of the internal affairs doctrine, the court stated: " ' "It is true that the courts in California cannot control the internal affairs of any foreign corporation. Such matters are to be conducted in pursuance of and in compliance with the provisions of the charter of the foreign corporation, and the laws of the country where it was created; but in the management and method of its business affairs in California with the citizens and residents thereof, *in the sale or disposition or transfer of the shares of stock,* it must conform to the laws of California in relation to such matters, and is bound thereby. . . ." ' " (*Sobieski, supra,* 191 Cal.App.2d at pp. 409–410.)

More recently, the scope of California's securities laws was considered in *Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036 [80 Cal.Rptr.2d 828, 968 P.2d 539] (*Diamond Multimedia*). In *Diamond Multimedia* the defendants in a nationwide class action lawsuit brought under the unlawful market manipulation provisions of sections 25400 and 25500 argued that California could not provide a remedy for shareholders who did not purchase their shares in California. In rejecting this contention the court found that unlike section 25402, which is expressly limited to intrastate securities transactions, section 25400 is limited only to unlawful manipulative conduct which occurs in this state. The court found that when such unlawful

conduct in California harms out-of-state investors, section 25500 provides them with a remedy even if they did not buy or sell securities in this state. (*Diamond Multimedia, supra,* 19 Cal.4th at p. 1065.) In rejecting the defendants' contention that California had no interest in providing nonresident investors with a remedy, the court stated: "California also has a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices. California business depends on a national investment market to support our industry. The California remedy for market manipulation helps to ensure that the flow of out-of-state capital necessary to the growth of California business will continue. The Court of Appeal rejected a claim similar to that of petitioners and recognized the importance of extending state-created remedies to out-of-state parties harmed by wrongful conduct occurring in California in *Clothesrigger, Inc. v. G.T.E. Corp.* (1987) 191 Cal.App.3d 605 [236 Cal.Rptr. 605]. There the plaintiff sought damages for fraud, negligent misrepresentation and unfair business practices in the charges made by defendant for long distance telephone calls. The trial court denied certification of a nationwide class on the ground that a nationwide class was not suitable as California had no interest in providing greater protection to residents of other states than that provided by their home states. The Court of Appeal reversed that order, noting that defendant had identified no interest of any other state that might be affected by extending California's law to the injured nonresidents, and recognizing that 'California may have an important interest in applying its law to punish and deter the alleged wrongful conduct.' [Citation.]" (*Diamond Multimedia, supra,* 19 Cal.4th at pp. 1064–1065, fn. omitted.)

## III

### *Sections 25402, 25502 and 25502.5*

■ "Insider trading—the use of confidential information not available to the trading public to purchase or sell securities—is prohibited under federal law by section 10(b) of the 1934 Securities Exchange Act and Rule 10b-5 adopted by the Securities Commission pursuant to that statutory provision. Such conduct is also prohibited under provisions of the California Corporate Securities Law of 1968.

"The traditional theoretical justification for prohibiting insider trading is based on the notion that allowing persons who have access to non-public information to use it for securities trading will discourage individual investors without access to such information from trading in the securities markets. Thus, even though persistent arguments have been made by some economists that insider trading is good for the trading markets as a whole and should be

permitted, the overwhelming reaction in fact has consistently been to regard it as 'unfair' because it destroys the 'level playing field' among participants in the trading markets.

"In recent years, however, the public objections to insider trading have assumed larger dimensions. While at one time governmental prosecution of small-time insider trading might have been regarded by the general public as overzealous, the discovery of persistent, systematic insider trading activities yielding millions of dollars in profit to well-known securities professionals such as Ivan Boesky and Dennis Levine has changed the underlying objection to insider trading to one of basic morality and cultural values. . . . As described by one leading writer, 'Congress has begun to see the problem in more fundamental cultural terms as a manifestation of undue greed among the already well-to-do, worthy of legislative intervention if for no other reason than to send a message of censure on behalf of the American people.' " (Berger, *Issuer Recovery of Insider Trading Profits Under* Section 25502.5 of the California Corporation Code (1989–1990) 21 Pac. L.J. 221, 223, fns. omitted (Berger).)

By adoption of sections 25402, 25502 and 25502.5 California has supplemented federal regulation of insider trading. Section 25402 provides as follows: "It is unlawful for an issuer or any person who is an officer, director or controlling person of an issuer or any other person whose relationship to the issuer gives him access, directly or indirectly, to material information about the issuer not generally available to the public, to purchase or sell any security of the issuer in this state at a time when he knows material information about the issuer gained from such relationship which would significantly affect the market price of that security and which is not generally available to the public, and which he knows is not intended to be so available, unless he has reason to believe that the person selling to or buying from him is also in possession of the information."

█ Section 25402 was enacted in 1968 as part of the Corporate Securities Law of 1968. The face of the statute does not restrict its application to securities issued by domestic corporations. Rather as noted at the outset, by its terms section 25402 is only limited to securities transactions which occur in this state. This literal reading of section 25402 is consistent with the intention of the drafters of the Corporate Securities Law of 1968. In enacting the Corporate Securities Law of 1968, including section 25402, the drafters "agreed that the basis of jurisdiction and regulation should be the offer or sale of securities in this State and *should not be related to the principal place of business or corporate domicile*." (1 Marsh & Volk, Practice Under the Cal. Securities Laws (1998) History of Cal. Law § 1.06[3], p. 1-54, italics added (Marsh & Volk).)

As part of the Corporate Securities Law of 1968, the Legislature provided in section 25502 a civil remedy for violation of section 25402. Section 25502 states: "Any person who violates Section 25402 shall be liable to the person who purchases a security from him or sells a security to him, for damages equal to the difference between the price at which such security was purchased or sold and the market value which such security would have had at the time of the purchase or sale if the information known to the defendant had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information, plus interest at the legal rate, unless the defendant proves that the plaintiff knew the information or that the plaintiff would have purchased or sold at the same price even if the information had been revealed to him."

The remedy provided by section 25502 is problematic because private plaintiffs must establish privity between themselves and violators of section 25402. (See Marsh & Volk, *supra*, Civil Liabilities, § 14.04[5], p. 14-55.) Indeed, there is no record of any cases being brought under the provisions of sections 25402 and 25502 between 1968 and 1988. (Berger, *supra*, 21 Pac. L.J. at p. 233.) However, in the 1980's the integrity of the securities markets was threatened by revelations of extensive insider trading. (Berger, *supra*, 21 Pac. L.J. at pp. 222–224.) In response to these threats Congress enacted the 1984 Insider Trading Sanctions Act (15 U.S.C. §§ 78a, 78c, 78o, 78t, 78u, 78ff) and the 1988 Insider Trading & Securities Fraud Enforcement Act (15 U.S.C. §§ 78a, 78b, 78c, 78k, 78o, 78t, 78u, 78kk). As Professor Berger notes, our Legislature also felt a need to address the issue of insider trading. (Berger, *supra*, 21 Pac. L.J. at p. 224.) Our Legislature's response to the insider trading scandals of the 1980's was enactment in 1988 of section 25502.5.

Section 25502.5 provides in pertinent part: "(a) Any person other than the issuer who violates Section 25402 shall be liable to the issuer of the security purchased or sold in violation of Section 25402 for damages in an amount up to three times the difference between the price at which the security was purchased or sold and the market value which the security would have had at the time of the purchase or sale if the information known to the defendant had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information and shall be liable to the issuer of the security or to a person who institutes an action under this section in the right of the issuer of the security for reasonable costs and attorney's fees. [¶] . . . [¶]

"(d) This section shall only apply to issuers who have total assets in excess of one million dollars ($1,000,000) and have a class of equity security held of record by 500 or more persons."

Shortly after enactment of section 25502.5 Professor Berger made the following observation: "Except for new section 25502.5 of the California Corporations Code, no other state presently has a statutory provision making a person using inside information liable to the issuer of that security. [¶] . . . . The controversial aspect of such liability is that normally the issuer in whose favor the monetary recovery for insider trading is sought has sustained no monetary damages from the insider's use of confidential information for trading purposes. The enactment in California of section 25502.5 thus seems to be an important legislative decision that the absence of monetary injury to the issuer of the traded security is less important than the *deterrent* of insider trading by superimposing issuer-directed profit disgorgement to the already existing liability towards the person whose securities the insider purchased or towards the person to whom the insider sold." (Berger, *supra*, 21 Pac. L.J. at p. 226, fn. omitted, italics added.)

IV

*Section 2116 and the Internal Affairs Doctrine*

■ Section 2116 states: "The directors of a foreign corporation transacting intrastate business are liable to the corporation, its shareholders, creditors, receiver, liquidator or trustee in bankruptcy for the making of unauthorized dividends, purchase of shares or distribution of assets or false certificates, reports or public notices or other violation of official duty according to any applicable laws of the state or place of incorporation or organization, whether committed or done in this state or elsewhere. Such liability may be enforced in the courts of this state." As applied to directors' liability, section 2116 is a codification of the "internal affairs doctrine." (See *In re Flashcom, Inc.* (Bankr. C.D.Cal. 2004) 308 B.R. 485, 490.)

■ " 'The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands.' [Citation.] 'States normally look to the State of a business' incorporation for the law that provides the relevant corporate governance general standard of care.' [Citation.]

" 'Internal affairs' include ' "steps taken in the course of the original incorporation, . . . the adoption of by-laws, the issuance of corporate shares, the holding of directors' and shareholders' meetings, . . . *the declaration and payment of dividends* and other distributions, charter amendments, mergers, consolidations, and reorganizations, the reclassification of shares and the purchase and redemption by the corporation of outstanding shares of its own stock." ' [Citations.]

"As stated in the Restatement Second of Conflict of Laws: 'It would be impractical to have matters . . . which involve a corporation's organic structure or internal administration[] governed by different laws. It would be impractical, for example, if . . . an issuance of shares, *a payment of dividends*, a charter amendment, or a consolidation or reorganization were to be held valid in one state and invalid in another. . . . In the absence of an explicitly applicable local statute to the contrary, . . . the local law of the state of incorporation has been applied to determine issues involving corporate acts of the sort [mentioned].' [Citations.]" (*State Farm Mutual Automobile Ins. Co. v. Superior Court* (2003) 114 Cal.App.4th 434, 442–443 [8 Cal.Rptr.3d 56] (*State Farm*).)

In *State Farm* policyholders in an Illinois mutual insurance company sued the company and alleged that it had failed to properly pay them dividends out of the company's accumulated surplus. The plaintiff policyholders argued that their right to dividends was governed by the substantive law of California. The insurance company argued that under the internal affairs doctrine its dividend obligation was governed by the law of Illinois, where it was incorporated. The court agreed with the insurance company. However, in doing so it took pains to point out that while a corporation's decision to pay dividends was an internal affair, the doctrine had no application to enforcement of a forum state's corporate securities laws. The *State Farm* court, citing *Sobieski*, stated: "This is not to say that, in determining the liability of a foreign corporation, courts must always apply the law of the state of incorporation. 'In fields like torts, where the typical dispute involves two persons and a single or simple one-shot issue and where the common substantive policy is to spread the loss through compensation and insurance, the preference for forum law and the emphasis on the state interest in forum residents . . . [presents an acceptable application of forum law].' [Citation.]

[I]n the management and method of its business affairs in California with the citizens and residents thereof, in the sale or disposition or transfer of the shares of stock, [a foreign corporation] must conform to the [securities regulations] of California . . . .' [*Sobieski, supra,* 191 Cal.App.2d at p. 409]." (*State Farm, supra,* 114 Cal.App.4th at p. 447.)

This limitation on the internal affairs doctrine has been adopted by the reporters of Restatement Second of Conflict of Laws. The internal affairs doctrine is set forth in section 309 of the Restatement and provides: "The local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and shareholders, except where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the parties and the transaction, in which event the local law of the other state will be applied." In explaining the exception to the general rule, the reporters state: "The rule of this Section will be applied in the absence of an applicable local statute. Many states impose liability by statute upon the directors of foreign corporations for doing or failing to do, certain acts in the state. *Blue sky laws are typical examples of such statutes.*" (Rest.2d Conflict of Laws, § 309, comment a, italics added.) Bernard Witkin has also recognized this limitation on the internal affairs doctrine: "In some situations . . . the local court may, in the interest of justice, take jurisdiction over internal affairs and apply the local law. [Citation.] A typical example is the application of the Corporate Securities [Law of 1968] to protect California residents against fraud in the sale of securities of a foreign corporation." (9 Witkin, Summary of Cal. Law (10th ed. 2005) Corporations, § 239, p. 1006.)

The only reported case which has employed the internal affairs doctrine as codified in section 2116 as a bar to enforcement of California's corporate securities laws is *In re Sagent Technology, Inc. Derivative Litigation* (N.D. Cal. 2003) 278 F.Supp.2d 1079, 1090 (*Sagent*). In *Sagent* the court dismissed a shareholder's derivative claim brought under section 25402 against corporate directors. It appears from the court's discussion of the issue that the court was persuaded that the plaintiffs' insider claims were governed by the internal affairs doctrine because of the derivative nature of the claims asserted.[6] The

---

[6] In distinguishing *Diamond Multimedia*'s application of California securities laws to out-of-state transactions, the court in *Sagent* stated: "The suit was not a derivative action seeking recovery on behalf of a Delaware corporation, but rather a direct action seeking recovery on behalf of a class of investors for unlawful conduct that had occurred in California. [¶] Thus, the reasoning of the California Supreme Court in *Diamond Multimedia* is not directly applicable to the question whether the law of California or the law of Delaware should apply to the insider trading claim. While California, like all states, has an interest in preserving a business climate free of fraud, plaintiffs have not established that California has a more significant relationship to the parties and the transaction than does Delaware. Accordingly,

court in *Sagent* did not discuss and apparently did not consider *Williams v. Gaylord, Sobieski,* or the other authorities which have consistently found that a state's corporate securities laws are not subject to the internal affairs doctrine. Moreover, the court in *Sagent* did not discuss the history or purpose of California's insider trading prohibitions. For these reasons *Sagent* is not persuasive authority for limitation of those securities laws to securities issued by domestic corporations.

V

*The Trustee's Section 25502.5 Claims Are Not Barred by the Internal Affairs Doctrine*

■ Contrary to defendants' contention, the internal affairs doctrine as embodied in section 2116 does not prevent the trustee from bringing claims against them under section 25502.5. Defendants appear to accept the proposition that the Legislature's historic and well-established intent to regulate both intrastate conduct and intrastate securities transactions subject securities transactions which take place in this state to California's securities laws even if those securities are issued by foreign corporations. (See *Williams v. Gaylord, supra,* 186 U.S. at p. 165; *Sobieski, supra,* 191 Cal.App.2d at pp. 409–410; *Diamond Multimedia, supra,* 19 Cal.4th at pp. 1064–1065; Marsh & Volk, *supra,* § 1.06[3], p. 1-54; Rest.2d Conflict of Law, § 309, com. a; 9 Witkin, *supra,* Corporations, § 239, p. 1006.) Defendants argue however that an issuer's claim under section 25502.5 is *not* a securities regulation. Rather they suggest section 25502.5 gives rise to no more than a derivative breach of fiduciary duty claim which they argue is, for that reason, subject to the internal affairs doctrine. For a number of reasons we do not accept defendants' characterization of section 25502.5 as merely a device for enforcing directors' and officers' fiduciary duties to shareholders.

Defendants' characterization of section 25502.5 ignores the fact that, like section 25402, it is part of the Corporate Securities Law of 1968. Defendants also ignore the fact that section 25502.5 is a remedy for the substantive insider trading prohibition set forth in section 25402. As we have noted the prohibition on insider trading was adopted as a means of protecting

---

under the provisions of § 309 of the Restatement, the law of Delaware, the state of incorporation, should apply." (*Sagent, supra,* 278 F. Supp.2d at p. 1091.)

investor confidence in the securities market and more broadly as a means of punishing what is perceived by the public as immoral conduct. (See Berger, *supra,* 21 Pac. L.J. at pp. 222–224, 226.) These public interests are much broader than protection of a corporation's shareholders.

Defendants' assertion that section 25502.5 is limited to protection of shareholder interests also ignores two important aspects of insider trading regulation.

First, as Professor Berger has noted, in general corporations are not damaged when either they or their directors engage in insider trading. (Berger, *supra,* 21 Pac. L.J. at p. 226.) Thus section 25502.5 cannot be characterized as a means of compensating a corporation for losses it actually experiences when an officer or director engages in insider trading. Secondly, section 25402 prohibits issuers themselves from engaging in insider trading. Thus in compelling an officer or director to disgorge to an issuer profits realized by way of insider trading, section 25502.5 does not provide the issuer with compensation for any lost opportunity the issuer itself could have lawfully realized. These circumstances undermine defendants' contention that section 25502.5 is a remedy for any breach of fiduciary duty owed to the corporation. Section 25502.5 does not compensate for any loss a corporation experiences or recover any lawful corporate opportunity.

Reinforcing the public interest served by section 25502.5, as opposed to any narrow shareholder interest, are the treble profits the statute permits an issuer to collect from a violator of section 25402. The deterrence provided by this provision clearly demonstrates that in enacting section 25502.5 the Legislature was very much concerned about discouraging conduct it found destructive to the public interest.

In sum, the history of section 25502.5 and its provisions make it clear that it is very much a part of California's corporate securities regulation scheme and serves broad public interests rather than the more narrow interests of a corporation's shareholders. Given the public and regulatory interests section 25502.5 serves, it is not subject to the internal affairs doctrine as codified in section 2116.

Let a writ of mandate issue directing the trial court to vacate its order sustaining defendants' demurrers to the trustee's insider trading claims and conduct further proceedings consistent with the views we have expressed. Costs in the writ proceeding are awarded to the trustee.

McDonald, J., and McIntyre, J., concurred.

A petition for a rehearing was denied December 29, 2005, and on December 29, 2005, and January 24, 2006, the opinion was modified to read as printed above. The petition of real parties in interest for review by the Supreme Court was denied March 15, 2006, S141028. George, C. J., did not participate therein. Kennard, J., and Baxter, J., were of the opinion that the petition should be granted.