Filed 7/11/18; pub. order 8/10/18 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

MICHAEL COLACO et al.,

    Plaintiffs, Cross-defendants and
Appellants,

      v.

CAVOTEC SA et al.,

    Defendants, Cross-complainants and
Respondents.

G052619

(Super. Ct. No. 30-2012-00601735)

O P I N I O N

\* \* \*

        Appeal from a judgment of the Superior Court of Orange County, William D. Claster, Judge. Reversed and remanded.

        Stradling Yocca Carlson & Rauth, Jason H. Anderson, Jason de Bretteville and Bradley E. Marrett for Plaintiffs and Appellants.

        Greenberg Gross, Alan A. Greenberg, Wayne R. Gross and Howard M. Privette for Defendants and Respondents.

        \*          \*          \*

Appellants Inet Airport Systems, Inc., Inet Airport Systems, LLC,[1] Michael Colaco, and April Barry appeal from the judgment entered against them in this action arising from Inet's sale of its assets to respondents Cavotec SA and Cavotec Inet US, Inc. (collectively Cavotec). Colaco was Inet's sole shareholder and its chief executive officer and Barry was Inet's director of administration. After the transaction, Colaco became Cavotec Inet US, Inc.'s president and a member of its board of directors, and Barry became the company's chief financial officer.

Following a lengthy trial, the jury awarded Cavotec $1.313 million against Inet, Colaco, and Barry, jointly and severally, based on the jury's findings that (1) Inet breached its asset purchase agreement with Cavotec by failing to forward all postclosing customer payments Inet received on Cavotec's behalf; (2) Colaco and Barry breached the fiduciary duties they owed as Cavotec officers by causing Inet to withhold customer payments and creating false and backdated invoices to conceal Inet's failure to pay; (3) Colaco's conduct breached the employment contract he entered into as Cavotec Inet US Inc.'s president; and (4) Colaco and Barry converted Cavotec's funds for their personal use. The jury also awarded Cavotec $2 million in punitive damages against Colaco only.

On appeal, Inet argues the trial court erred in denying its motion for judgment notwithstanding the verdict (JNOV) because the undisputed evidence showed Cavotec breached the asset purchase agreement by failing to make its final $2 million payment. Inet contends the trial court should have offset that $2 million against the $1.313 million Inet failed to pay to Cavotec, and the net result is a judgment for $687,000 in Inet's favor.

---

[1] Inet Airport Systems, LLC is Inet Airport Systems, Inc.'s successor in interest, but for convenience we refer to them collectively as Inet.

We agree the trial court erred in denying Inet's motion. Cavotec's obligation to make the final $2 million payment and Inet's obligation to turn over all postclosing payments to Cavotec are independent covenants under the asset purchase agreement. Inet's breach of its obligation therefore did not excuse Cavotec from its obligation. Rather, Cavotec was contractually required to perform and then seek damages or an offset from Inet. The jury's verdict, however, excused Cavotec from its obligation based on Inet's breach and awarded Cavotec damages for the same breach. That is an impermissible windfall that allows Cavotec to retain the assets it purchased from Inet without paying the full purchase price.

Colaco contends the trial court erred in refusing to apply Delaware law to the claims against him because Cavotec Inet US, Inc., was incorporated in Delaware, and therefore the internal affairs doctrine required the court to apply Delaware law in resolving the issues regarding Colaco's performance as an officer of Cavotec Inet US, Inc. Colaco asserts he was entitled to judgment on Cavotec's fiduciary duty and punitive damages claims because Delaware law bars fiduciary duty claims that arise from contractual obligations and prohibits punitive damages on fiduciary duty claims.

We disagree. In Colaco's employment agreement, he and Cavotec Inet US, Inc. agreed California law would govern all their rights and liabilities. California law recognizes a strong public policy favoring enforcement of choice-of-law provisions and our courts may refuse to enforce a provision bearing a reasonable relationship to the parties or their transaction only when the opponent shows a state other than the one on which the parties agreed has a materially greater interest in the determination of the particular issues involved. Colaco fails to explain how Delaware has a materially greater interest in applying its law on the fiduciary duty claims raised in this case. Instead, he simply argues the internal affairs doctrine establishes a bright line rule that overrides the parties' choice-of-law provision. It does not, and Colaco fails to explain how applying California law on these particular issues will impair internal corporate affairs.

3

Barry also argues the internal affairs doctrine required the trial court to apply Delaware law regarding the fiduciary duty and punitive damages claims against her. Barry's position differs from Colaco's because she did not enter into a contract with Cavotec Inet US, Inc. and she never agreed California law would govern her rights and liabilities. Nonetheless, we need not decide whether the internal affairs doctrine required the trial court to apply Delaware law because the result on the claims against Barry are the same under both Delaware and California law, and therefore Barry cannot establish any error was prejudicial.

We also reject Colaco's contention the asset purchase agreement barred Cavotec's claims for breach of his employment contract and punitive damages. As explained below, the exclusive remedy provision on which Colaco relies only applies to claims arising under the asset purchase agreement, but Cavotec sued Colaco for breaching his fiduciary duties and his employment agreement, not the asset purchase agreement. Contrary to Colaco's contention, the jury's decision to award Cavotec damages on its claim against Inet for breach of the asset purchase agreement and award the same amount of damages for Colaco's breach of his employment contract does not mean the jury held Colaco liable for Inet's breach of the asset purchase agreement. Rather, it simply means the breach of those separate agreements resulted in the same damages, nothing more. Similarly, the punitive damages waiver in the asset purchase agreement does not apply to Cavotec's punitive damages claim against Colaco because that claim is not made under the asset purchase agreement.

We conclude Cavotec's $1.313 award against Inet must be offset against its failure to make the second $2 million payment owed under the APA. Finally, for the reasons expressed at the end of this opinion, we leave undisturbed Cavotec's $2 million punitive damage award against Colaco.

4

# I

## FACTS AND PROCEDURAL HISTORY

Inet was headquartered in Fullerton, California. It designed, manufactured, and installed stationary and mobile airport and aircraft servicing equipment at airports around the world. Michael Colaco was Inet's chief executive officer and its sole shareholder. April Barry was Inet's director of administration. Cavotec SA is a global engineering company headquartered in Lugano, Switzerland. It has 42 subsidiaries that operate in 30 countries.

In August 2011, Colaco and Inet entered into the "Asset Purchase Agreement and Plan of Reorganization" (APA) with Cavotec SA and Cavotec Inet US Inc., a Delaware corporation Cavotec SA formed as a subsidiary for this transaction.[2] Under the APA, Inet agreed to sell substantially all of its assets to Cavotec, including Inet's long-term, in-process customer contracts, Inet's inventory and equipment, all leasehold improvements to Inet's manufacturing facility, and Inet's intellectual property. In exchange, Cavotec agreed to transfer to Inet 7.7 million shares of Cavotec SA stock and make two, $2 million "Performance Earn-out Payments" to Inet, one on the APA's first anniversary in August 2012 and another on its second anniversary in August 2013. In the APA, the parties valued the Cavotec SA shares at nearly $21 million. Although Colaco was a signatory to the APA, he gave only a limited number of warranties and assumed minor obligations that are not at issue.

When the APA closed, Colaco became Cavotec Inet US, Inc.'s president and a member of its board of directors, and Barry became the company's chief financial officer. To govern the terms of Colaco's employment, he and Cavotec entered into a "Contract of Employment" (Employment Contract) that required Colaco to "devote his

---

[2] At the time of this transaction, Cavotec SA was known as Cavotec MSL Holdings Ltd.

5

best efforts and all his business time to the business and operations of [Cavotec]." The Employment Contract also included a choice-of-law provision that stated, "All the rights and liabilities of the parties shall be governed by and construed in accordance with the law of California." Barry did not enter into an employment agreement with Cavotec.

The in-process customer contracts were the primary assets Cavotec acquired under the APA. Inet could not transfer those contracts to Cavotec without the customers' consent, but the parties closed on the APA before any customers consented. Inet and Cavotec therefore executed an additional document entitled the "Guidelines for Contracts" (Guidelines). Under the Guidelines, Inet agreed to cooperate with Cavotec in obtaining each customer's consent and to continue performing each contract until the customer consented to the transfer. The Guidelines also provided that Inet was responsible for all costs and entitled to all profits that were incurred or earned on a contract before the APA closed, and Cavotec promised to reimburse Inet for any costs it incurred after the APA closed, but Cavotec would be entitled to any postclosing profits. Inet agreed to forward to Cavotec any postclosing payments it received from customers to which Inet was not entitled under the Guidelines. After the deal closed, numerous disagreements arose between Colaco and Cavotec regarding Inet's business, the efforts of Colaco and Inet to obtain the consents necessary to transfer the customer contracts, and whether Inet transferred all required customer payments to Cavotec. Based on these disagreements, Cavotec refused to make the first Performance Earn-out Payment when it came due in mid-August 2012, and it asked Colaco to step down as president of Cavotec Inet US, Inc. In late August 2012, Cavotec SA's chairperson and its chief executive officer met with Colaco to discuss how they amicably could part ways. These discussions resulted in a one-page document entitled, "Memorandum of Understanding" (MOU). Under the MOU, Cavotec agreed to pay the first Performance Earn-out Payment and accelerate the second so that the entire $4 million would be paid by mid-September 2012. It also agreed to pay Colaco for certain tenant improvements identified in the

6

APA. In return, Colaco agreed to immediately resign as both a director and president of Cavotec Inet US, Inc., and to cooperate in completing the transition of Inet's business to Cavotec.

A few days after the parties entered into the MOU, Cavotec locked Colaco and Barry out of its facilities because it suspected they were soliciting employees to start a competing business and destroying or stealing files rather than working cooperatively to transition Inet's business to Cavotec. Cavotec paid the first Performance Earn-out Payment by the September date specified in the MOU and told Colaco it was withholding the second $2 million payment until it completed an investigation of Colaco's and Barry's conduct. After completing its investigation, Cavotec refused to make the second payment because it concluded Inet had failed to forward customer payments it received on Cavotec's behalf. Cavotec also found Colaco and Barry had falsified invoices and backdated others to inflate the amount of customer payments Inet was entitled to retain, had instructed employees to send customers improper or defective products to damage Cavotec's business, and had sabotaged Cavotec by stealing and destroying files.

In October 2012, Colaco and Inet filed this lawsuit alleging Cavotec breached the APA as amended by the MOU. The complaint sought the second $2 million Performance Earn-out Payment and other payments Cavotec agreed to make under both the APA and the MOU.[3] Cavotec answered the complaint, alleging the amendments to the APA made by the MOU were unenforceable because Colaco fraudulently induced Cavotec to enter into the MOU through misrepresentations and false promises he did not intend to perform. Cavotec further alleged Inet's breach of the APA excused its performance under the contract.

---

[3] The complaint also asserted a fraudulent inducement claim, alleging Cavotec SA's chairperson and chief executive officer induced Colaco to enter into the MOU by falsely promising to make both Performance Earn-out Payments in September 2012. The jury rejected that claim and it is not at issue on appeal.

Cavotec also filed a cross-complaint against Inet, Colaco, and Barry. Cavotec alleged Inet breached the APA and the Guidelines, and also alleged a common count for money had and received based on the postclosing customer payments Inet received on Cavotec's behalf, but failed to forward to Cavotec. Cavotec separately alleged Colaco breached his Employment Contract and the fiduciary duties he owed as an officer of Cavotec Inet US, Inc. by creating false and backdated invoices and engaging in other misconduct that caused Inet to withhold customer payments owed to Cavotec.[4] Based on her cooperation with Colaco, Cavotec also alleged Barry breached her fiduciary duty as an officer of Cavotec Inet US, Inc. Finally, Cavotec alleged Colaco and Barry converted certain of its funds to their personal use. As damages, the cross-complaint sought the customer payments Inet withheld and the lost profits caused by Colaco and Barry's misconduct. Cavotec also sought punitive damages against Colaco and Barry.

Shortly before trial, Colaco and Barry moved ex parte to strike Cavotec's fiduciary duty claims because Delaware law governed and did not authorize a jury trial for breach of fiduciary duty. Colaco and Barry argued the court should apply Delaware's internal affairs doctrine, which is a conflict of law principle that generally provides the law of the incorporating state governs the corporation's internal affairs. The trial court denied the motion, concluding the internal affairs doctrine did not apply because Cavotec's fiduciary duty claims are "more about a series of purported actions . . . that contravene both statutory law and the public policy of California" than anything "'peculiar'" to the relationship between a corporation and its officers. The court explained its decision to apply California law was based on the nature of the misconduct

---

[4] Cavotec also alleged that Colaco engaged in other misconduct that harmed its business, but the jury awarded damages based solely on the amount of customer payments Inet withheld from Cavotec. Cavotec does not challenge the jury's verdict.

8

alleged in the cross-complaint, but it would reconsider the ruling if the evidence at trial disclosed additional or different misconduct.

The trial court conducted a six-week jury trial in May and June 2015. On the complaint, Inet and Colaco asked the jury to award nearly $3.8 million for Cavotec's breach of the APA and MOU based on Cavotec's failure to make the second, $2 million Performance Earn-out Payment and various other sums it failed to pay under those agreements. On the cross-complaint, Cavotec sought approximately $3.8 million it claimed Inet collected, but failed to pay to Cavotec under the APA and the Guidelines plus approximately $15.4 million in lost profits stemming from Colaco and Barry's breach of their fiduciary duty. At the close of evidence, Colaco and Barry renewed their request for the court to apply Delaware law to the fiduciary duty claims, but the court again concluded California law governed.

The jury returned a verdict for Cavotec on the complaint, finding it was not liable to Colaco or Inet. On the cross-complaint, the jury returned a verdict for Cavotec and awarded $1.313 million in damages against Colaco, Barry, and Inet, jointly and severally. Specifically, the jury found (1) Inet was liable for breach of the APA and the Guidelines, and for money had and received; (2) Colaco was liable for breach of the Employment Contract, breach of fiduciary duty, and conversion; and (3) Barry was liable for breach of fiduciary duty and conversion. On the conversion claims, the jury found Colaco had converted $6,000 of Cavotec's funds and Barry had converted $20,000, but those amounts were included in the $1.313 million award. Finally, the jury found Colaco and Barry acted with malice, oppression, or fraud, but Inet did not. Following a separate phase of the trial regarding Colaco's and Barry's financial condition, the jury awarded Cavotec $2 million in punitive damages against Colaco and no punitive damages against Barry.

After the trial court entered judgment on the jury's verdict, Inet, Colaco, and Barry filed a JNOV motion. First, Colaco and Barry argued both the breach of

9

fiduciary duty claims and the punitive damages claims failed as a matter of Delaware law because the claim for breach of the APA necessarily subsumed the breach of fiduciary duty claims and Delaware law did not authorize punitive damages for breach of fiduciary duty. Next, Colaco argued the exclusive remedy provision in the APA barred the claim for breach of the Employment Contract and any punitive damage claim. Finally, Inet argued it was entitled to an offset for the second, $2 million Performance Earn-out Payment Cavotec admittedly did not pay because Cavotec's obligation to make that payment was independent of Inet's obligation to turn over the customer payments it received. Inet further argued Cavotec would receive a windfall unless the court applied an offset because the jury's verdict both excused Cavotec from paying the final $2 million under the APA based on Inet's failure to forward the sums it collected on Cavotec's behalf, and awarded damages against Inet for those same sums. According to Inet, the net result of this offset is a nearly $700,000 judgment in its favor against Cavotec based on the amount of the damages the jury found on the cross-complaint.

The trial court denied the motion. In rejecting Colaco's argument that Delaware law governed the claims against him, the trial court cited its earlier ruling on the ex parte application to strike Cavotec's jury demand and also emphasized that Colaco's Employment Contract included a choice-of-law clause that provided California law would govern Colaco's and Cavotec's rights and liabilities. This appeal followed.

II

DISCUSSION

A.    *Inet Was Entitled to Judgment Notwithstanding the Verdict on Its Claim Cavotec Breached the APA*

Inet contends the trial court erred in denying the motion for judgment notwithstanding the verdict on Inet's claim for breach of the APA because Cavotec's obligation to pay the final $2 million Performance Earn-out Payment was independent of

10

Inet's obligation to forward the postclosing customer payments it received on Cavotec's behalf. According to Inet, it was entitled to judgment on its claim for breach of the APA because Cavotec did not dispute it failed to make the final $2 million payment and Cavotec's successful claim Inet breached the APA by failing to forward customer payments merely provided an offset, not an excuse for nonperformance. We agree.

"On appeal from the denial of a . . . motion [for judgment notwithstanding the verdict], we 'review[] the record in order to make an independent determination whether there is any substantial evidence to support the jury's findings.' [Citation.] 'The scope of the review is limited to determining whether there is any substantial evidence, contradicted or not, to support the jury's verdict. [Citation.] Applying the substantial evidence rule, we resolve "all conflicts in the evidence and all legitimate and reasonable inferences that may arise therefrom in favor of the jury's findings and the verdict. [Citations.]" [Citation.] Thus, this court must accept as true the evidence supporting the verdict, disregard conflicting evidence, and indulge every legitimate inference to support the verdict. [Citation.] Accordingly, we do not weigh the evidence or judge the credibility of the witnesses. [Citation.] If sufficient evidence supports the verdict, we must uphold the trial court's denial of the . . . motion [for judgment notwithstanding the verdict].'" (*Scott v. Ford Motor Co.* (2014) 224 Cal.App.4th 1492, 1499; see *Linear Technology Corp. v. Tokyo Electron, Ltd.* (2011) 200 Cal.App.4th 1527, 1532.)

The obligations of the parties to a contract are either dependent or independent. (*Verdier v. Verdier* (1955) 133 Cal.App.2d 325, 334 (*Verdier*).) The parties' obligations are dependent when the performance by one party is a condition precedent to the other party's performance. In that event, one party is excused from its obligation to perform if the other party fails to perform. (*Kaupke v. Lemoore Canal & Irr.* (1937) 20 Cal.App.2d 554, 557-558 (*Kaupke*); *Starr v. Davis* (1930) 105 Cal.App. 632, 635 (*Starr*).) If the parties' obligations are independent, the breach by one party does not excuse the other party's performance. Instead, the nonbreaching party still must

11

perform and its remedy is to seek damages from the other party based on its breach of the contract. (*Fresno Canal & Irr. Co. v. Perrin* (1915) 170 Cal. 411, 416 (*Perrin*); *Hall v. Dekker* (1941) 45 Cal.App.2d 783, 788 (*Hall*); *Starr*, at p. 635.)

"The law is settled that where covenants of a contract are to be performed at different times, they are independent, and the breach by one party of his covenant does not excuse the performance by the other party of his covenant or relieve him of liability for damages for a breach thereof." (*Hall*, *supra*, 45 Cal.App.2d at p. 788; see *Perrin*, *supra*, 170 Cal. at p. 416; *Kaupke*, *supra*, 20 Cal.App.2d at pp. 557-558.) "'The payment of money cannot be made dependent on the performance by the other party of a condition which, by the very terms of the contract, is not to be performed, or may not be performed until after the date at which the money is to be paid.'" (*Starr*, *supra*, 105 Cal.App. at p. 635.) Moreover, "'[w]hen a covenant or promise goes only to a part of the consideration, and a breach thereof may be paid for in damages, it is an independent covenant or promise.'" (*Ibid*.; see *Verdier*, *supra*, 133 Cal.App.2d at p. 334)

Whether specific contractual obligations are independent or dependent is a matter of contract interpretation based on the contract's plain language and the parties' intent. (*Verdier*, *supra*, 133 Cal.App.2d at p. 334.) Dependent covenants or "[c]onditions precedent are not favored in the law [citations], and courts shall not construe a term of the contract so as to establish a condition precedent absent plain and unambiguous contract language to that effect." (*Frankel v. Board of Dental Examiners* (1996) 46 Cal.App.4th 534, 550; see *Verdier*, at p. 334 ["To construe covenants as dependent is to work a forfeiture as to one party, and no obligation of a contract is to be regarded as a condition precedent unless made so by express terms or necessary implication"]; *Starr*, *supra*, 105 Cal.App. at p. 635 ["'Courts are disinclined . . . to construe the stipulations of a contract as conditions precedent, unless compelled by the language of the contract plainly expressed'"].) Where, as here, the parties present no extrinsic evidence on the meaning of their contract, we independently interpret the

12

contract to determine whether its covenants are independent or dependent. (See *Banning Ranch Conservancy v. Superior Court* (2011) 193 Cal.App.4th 903, 915-916.)

In *Starr*, the plaintiff sold his florist business to the defendant. The parties' contract provided for the defendant to make a down payment and give the plaintiff a promissory note for the balance. The contract also included a noncompetition provision that prevented the plaintiff from engaging in a competing business during a specified period. When the defendant failed to pay on the promissory note, the plaintiff sued to recover the balance. The defendant argued the plaintiff had breached the noncompetition provision and thereby excused the defendant from his obligation to pay the balance. (*Starr*, *supra*, 105 Cal.App. at p. 633.) The trial court rejected this defense, but on the defendant's cross-complaint, the court awarded the defendant the damages caused by the plaintiff's breach as an offset against the amount due under the purchase agreement and note. (*Id*. at p. 634.)

The Court of Appeal affirmed, finding the plaintiff's obligation to pay and the defendant's obligation not to compete were independent covenants because they required performance at different times and the plaintiff could compensate the defendant with damages caused by the plaintiff's breach of the noncompetition provisions. (*Starr*, *supra*, 105 Cal.App. at pp. 635-636.) The court further explained, "[T]he effect of upholding [defendant's contention] would be to say that as a penalty for plaintiff's breach, defendant might keep the business without paying therefor. In other words, that if 'A' purchased a business from 'B,' agreeing to pay therefor $10,000, and paying at the time of agreement merely $100 with promissory notes for the balance, and 'B' had agreed not to carry on a similar business within legally permissible limits, then upon 'B's' slightest breach of this covenant 'A' should retain the business and be absolved from the obligation evidenced by the notes. Such is not the law."[5] (*Id*. at pp. 634-635;

---

[5] Cavotec asserts *Starr* is inapposite because it involved the nonpayment of a promissory note, but Cavotec fails to explain how *Starr* and the principles it applies are

13

see *Verdier*, *supra*, 133 Cal.App.2d at pp. 334-335 [wife's breach of separation agreement provision barring her from molesting husband did not excuse husband's obligation to pay monthly support under agreement, but rather established claim for damages caused by wife's breach]; *Hall*, *supra*, 45 Cal.App.2d at p. 788.)

Under the APA, Inet agreed to transfer to Cavotec substantially all of its assets, and Cavotec agreed to transfer to Inet nearly $21 million in Cavotec SA stock and make two, $2 million Performance Earn-out Payments. Recognizing Inet's ongoing customer contracts required the approval of its customers for Inet to transfer the contracts and those consents would not be obtained before the deal closed, the parties also agreed on certain guidelines that required Inet to continue performing on the contracts until they obtained the necessary consents, to work with Cavotec to obtain the consent of customers, and to forward to Cavotec customer payments Inet received for work performed and products delivered after the closing.

Nothing in the APA or the Guidelines conditioned Cavotec's obligation to make the second Performance Earn-out Payment on Inet timely and properly forwarding to Cavotec all postclosing customer payments. These agreements required Cavotec and Inet to perform at different times the obligations at issue. Cavotec was to transfer the stock to Inet at the closing, and make the Performance Earn-out Payments on the APA's first and second anniversaries. Inet was to transfer all of its assets at closing except the ongoing customer contracts. As to those ongoing contracts, Inet agreed to continue honoring the contracts until the customers consented to the transfer and it agreed to forward customer payments to Cavotec under those contracts as Inet received them. The parties expressly acknowledged the ongoing contracts could be transferred in a matter of

limited to cases involving a promissory note. Not surprisingly, those principles have been applied in a number of cases that did not involve a promissory note. (See, e.g., *Perrin*, *supra*, 170 Cal. at pp. 415-416; *Verdier*, *supra*, 133 Cal.App.2d at pp. 333-335; *Kaupke*, *supra*, 20 Cal.App.2d at pp. 557-559.)

weeks or could require Inet to perform and forward the payments for an indefinite period. Finally, the customer payments Inet agreed to forward to Cavotec represented only a portion of the consideration Inet contributed to the transaction and damages could be awarded for Inet's breach of that obligation.

We therefore conclude Cavotec's obligation to make the final $2 million Performance Earn-out Payment was independent of Inet's obligation to forward to Cavotec any postclosing customer payments. (*Perrin*, *supra*, 170 Cal. at p. 416; *Verdier*, *supra*, 133 Cal.App.2d at p. 334; *Hall*, *supra*, 45 Cal.App.2d at p. 788; *Kaupke*, *supra*, 20 Cal.App.2d at p. 5557-558; *Starr*, *supra*, 105 Cal.App. at p. 635.) Inet's breach of the APA and Guidelines by failing to forward certain customer payments to Cavotec therefore did not excuse Cavotec from its obligation to make the final Performance Earn-out payment. Instead, Inet's breach resulted in a damage award on Cavotec's breach of contract claim alleged in the cross-complaint. Cavotec was still required to make the final Performance Earn-out Payment and the undisputed evidence shows Cavotec breached the APA by failing to make that payment.[6]

The trial court nonetheless denied Inet's motion for judgment notwithstanding the verdict because it concluded Inet had to prove it performed under the APA as an element of its claim, and substantial evidence supported a jury finding that

[6] The MOU does not change our analysis. Although the MOU accelerated the second Performance Earn-out Payment, it did not make the payment conditional on Inet timely and properly forwarding all postclosing customer payments to Cavotec. In our analysis, we focus on the terms of the APA and the Guidelines because both sides argued at trial that the other fraudulently induced them to enter into the MOU through false promises. The jury appears to have rejected these claims and found the MOU enforceable because it did not award either side damages on their false promise claim regarding the MOU. Nonetheless, regardless of whether the MOU was enforceable and modified the APA, we conclude Cavotec's obligation to make the second Performance Earn-Out Payment is independent of Inet's obligation to forward the postclosing customer payments to Cavotec under the original APA and the APA as modified by the MOU.

15

Inet failed to perform all of its obligations under the APA, including the obligation to transfer the ongoing customer contracts and to create a cooperative working relationship with Cavotec. Although we agree substantial evidence supports a finding Inet failed to perform all of its obligations under the APA, we disagree that failure excused Cavotec from its obligation to make the final Performance Earn-out Payment. The jury's verdict and the court's ruling denying Inet's motion failed to appreciate Cavotec's obligation to make the final Performance Earn-out Payment was independent of any obligation Inet failed to perform under the APA.

Moreover, the trial court's ruling fails to account for the damages the jury awarded Cavotec on its cross-complaint. Setting aside the independent nature of Cavotec's obligation to make the final Performance Earn-out Payment, the court's denial of Inet's motion for judgment notwithstanding the verdict results in a windfall for Inet because the verdict both excuses Cavotec from its obligation to make the final $2 million payment under the APA and awards Cavotec $1.313 million in damages based on the same breach of the APA by Inet. Indeed, when we consider the verdicts on the complaint and cross-complaint together, the jury effectively awarded Cavotec $3.313 million in damages even though it only found Cavotec suffered $1.313 million in damages.

Cavotec suggests the jury's verdict should be upheld because the jury may have found Inet breached the APA in more ways than just failing to turn over the customer payments Inet received on Cavotec's behalf. This argument fails because the jury awarded the identical amount on Cavotec's claim for money had and received as it awarded on Cavotec's claim for breach of the APA, which showed the jury based its breach of contract finding only on Inet's failure to turn over customer payments. The argument also ignores the independent nature of Cavotec's obligation to pay the final Performance Earn-out Payment. That obligation was not tied to any contractual obligations that Inet breached, and therefore Inet's breach of those obligations did not excuse Cavotec from its obligation to make the final payment.

16

Finally, Cavotec contends we should uphold the jury's verdict on Inet's breach of the APA because Inet's right to receive the Performance Earn-out Payments was conditional under the APA's express language and Inet failed to show it satisfied those conditions. In support, Cavotec points to section 2.8 of the APA, which states the Performance Earn-out Payments are "subject to the conditions set forth below" and then provides as follows: "[Inet] shall earn and become entitled to the Performance Earn-out Payments, or a pro rata portion thereof, based on the performance and satisfaction of reasonable objectives of the Business, designated by [Cavotec] following the Closing, and agreed to by [Inet], not to be unreasonably withheld, which shall include, but not be limited to, goals for new market penetration of the products and services of the Business (both within the United States and internationally), increasing sales and market share of the products and services of the Business, customer introductions, and integration of products and services used in the aviation ground support markets with [Cavotec's] (and [Cavotec's] affiliates) products and services used in maritime port markets."

Cavotec waived this argument because it failed to assert it during trial or in opposition to Inet's motion for judgment notwithstanding the verdict (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 685 ["Contentions or theories raised for the first time on appeal are not entitled to consideration"]), and the record nonetheless lacks substantial evidence to support the argument. Cavotec never argued to the jury that Inet's right to receive the Performance Earn-out Payments was conditioned on the performance and satisfaction of reasonable objectives for the business, and Cavotec cites no evidence showing it ever designated any objectives for the business as contemplated by section 2.8 of the APA. To the contrary, the evidence shows the parties treated the passage of time as the only condition to the

17

Performance Earn-out Payments and that Cavotec made the first Performance Earn-out Payment without showing any business objectives were met.[7]

Cavotec cites an isolated reference in Colaco's testimony and another in his attorney's closing argument that the Performance Earn-out Payments were tied to the business's financial success. Cavotec, however, takes these statements out of context and were made only to rebut Cavotec's argument that Colaco sought to destroy the business after the closing so he could repurchase it at a discount. These statements are not substantial evidence supporting the verdict against Inet on its breach of the APA claim because Cavotec never argued to the jury Inet failed to satisfy the conditions that would entitle it to receive the Performance Earn-out Payments.

Accordingly, based on the undisputed evidence that Cavotec failed to make the final $2 million Performance Earn-out Payment, we conclude the trial court erred in denying Inet's motion for judgment notwithstanding the verdict on Inet's claim for breach of the APA. We address how this error affects the overall judgment in the final section of this opinion.

---

[7] To the extent the jury found the MOU enforceable, the MOU's modification of the APA defeats Cavotec's contention the jury rejected Inet's breach of contract claim because Inet failed to show it satisfied the conditions for receiving the second Performance Earn-out Payment. In accelerating the second payment by nearly a year, the MOU eliminates or declares satisfied any condition the APA placed on that payment. Specifically, the MOU states, "Cavotec S.A. confirms and agrees that the complete earnout payment in the amount of 4million USD dollars will be released on September 14th, 2012."

B.      *The Trial Court Properly Applied California Law to the Claims Against Colaco*

1.      Governing Conflict of Law Principles

a.      *Choice-of-Law Provisions*

California law reflects a strong public policy favoring enforcement of freely negotiated choice-of-law clauses.  (*Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 462, 464-465 (*Nedlloyd*).)  Provided the parties or their transactions have a substantial relationship to the state whose laws they selected, or some other reasonable basis for the parties' choice of law exists, California courts will enforce a choice-of-law provision unless (1) the chosen state's law conflicts with a fundamental public policy of the state whose law otherwise would apply, and (2) the other state "has a 'materially greater interest than the chosen state in the determination of the particular issue.'" (*Nedlloyd*, at p. 466; see *Expansion Pointe Properties Limited Partnership v. Procopio, Cory, Hargreaves & Savitch, LLP* (2007) 152 Cal.App.4th 42, 59.)

The Supreme Court adopted this standard from the Restatement Second of Conflicts of Laws, section 187, subdivision (2).  (*Nedlloyd*, *supra*, 3 Cal.4th at pp. 464-465.)  The Restatement provides the following rationale for this rule:  "Prime objectives of contract law are to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract.  These objectives may best be attained in multistate transactions by letting the parties choose the law to govern the validity of the contract and the rights created thereby.  In this way, certainty and predictability of result are most likely to be secured.  Giving parties this power of choice is also consistent with the fact that, in contrast to other areas of the law, persons are free within broad limits to determine the nature of their contractual obligations." (Rest.2d Conf. of Laws, § 187, com. e, p. 565.)

The party seeking to enforce the choice-of-law provision bears the burden to establish a sufficient relationship to the state whose law the parties chose, but the party

opposing the provision's enforcement bears the burden to establish a fundamental conflict in the states' laws and the nondesignated state's materially greater interest in the determination of the particular issue. (*Washington Mutual Bank, FA v. Superior Court* (2001) 24 Cal.4th 906, 917 (*Washington Mutual*).) When, as here, the relevant facts are undisputed, enforcement of a choice-of-law provision presents a question of law we review de novo. (*Rincon EV Realty LLC v. CP III Rincon Towers, Inc.* (2017) 8 Cal.App.5th 1, 10.)

In *Nedlloyd*, the plaintiff corporation sued one of its shareholders for breaching a shareholders' agreement and the shareholder's fiduciary duties to the corporation. In ruling on the shareholder's demurrer, the trial court applied California law because it found unenforceable a choice-of-law provision in the shareholders' agreement that designated Hong Kong law to govern the parties' agreement. (*Nedlloyd*, *supra*, 3 Cal.4th at pp. 462-463.) The Supreme Court reversed, finding the parties and their transactions had a substantial relationship with Hong Kong because the corporation was incorporated there, it had a registered office in Hong Kong, and another shareholder resided there. (*Id*. at pp. 467-468.) Moreover, the court determined the corporation, as the party opposing enforcement of the choice-of-law clause, failed to identify a fundamental California public policy that would be offended by the application of Hong Kong law to the parties' dispute. Absent such a fundamental public policy, the Court concluded the corporation could not avoid its agreement to be bound by Hong Kong law. (*Id*. at pp. 470-471.)

b. *Internal Affairs Doctrine*

""""The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation

20

could be faced with conflicting demands."'" (*Lidow v. Superior Court* (2012) 206 Cal.App.4th 351, 358-359 (*Lidow*); see *Friese v. Superior Court* (2005) 134 Cal.App.4th 693, 706 (*Friese*); *State Farm Mutual Automobile Ins. Co. v. Superior Court* (2003) 114 Cal.App.4th 434, 442 (*State Farm*).)

"'Matters falling within the scope of the [internal affairs doctrine] . . . include steps taken in the course of the original incorporation, the election or appointment of directors and officers, the adoption of by-laws, the issuance of corporate shares, preemptive rights, the holding of directors' and shareholders' meetings, methods of voting including any requirement for cumulative voting, shareholders' rights to examine corporate records, charter and by-law amendments, mergers, consolidations and reorganizations and the reclassification of shares.'" (*Lidow*, *supra*, 206 Cal.App.4th at p. 359, quoting Rest.2d Conf. of Laws, § 302, com. a, p. 307; see *Friese*, *supra*, 134 Cal.App.4th at p. 707.) The internal affairs doctrine recognizes "'[i]t would be impractical to have matters . . . which involve a corporation's organic structure or internal administration[] governed by different laws." (*Lidow*, at p. 359, quoting Rest.2d Conf. of Laws, § 302, com. e, p. 310; see *Friese*, at p. 707.)

"'The policy underlying the internal affairs doctrine is an important one . . . : "Under the prevailing conflicts practice, neither courts nor legislatures have maximized the imposition of local corporate policy on foreign corporations but have consistently applied the law of the state of incorporation to the entire gamut of internal corporate affairs. In many cases, this is a wise, practical, and equitable choice. It serves the vital need for a single, constant and equal law to avoid the fragmentation of continuing, interdependent internal relationships. . . . It facilitates planning and enhances predictability. . . ."'" (*State Farm*, *supra*, 114 Cal.App.4th at pp. 443-444; see *Lidow*, *supra*, 206 Cal.App.4th at p. 359.)

"'[T]he law of one state [therefore generally] governs the relationships of a corporation to its stockholders, directors and officers in matters of internal corporate

21

governance. The alternatives present almost intolerable consequences to the corporate enterprise and its managers. With the existence of multistate and multinational organizations, directors and officers have a significant right . . . to know what law will be applied to their actions. Stockholders also have a right to know by what standards of accountability they may hold those managing the corporation's business and affairs.'" (*State Farm*, *supra*, 114 Cal.App.4th at p. 444; see *Lidow*, *supra*, 206 Cal.App.4th at p. 359.)

Although California courts generally follow the internal affairs doctrine and apply the laws of a corporation's state of incorporation to resolve disputes concerning a corporation's internal affairs, they do not blindly apply the doctrine. Instead, California courts carefully examine the specific issue and conduct to determine whether the corporation's internal affairs truly are implicated and whether the doctrine's policies require its application in the particular case. (See *Lidow*, *supra*, 206 Cal.App.4th at pp. 359, 362-363; see *Friese*, *supra*, 134 Cal.App.4th at pp. 707-709; *State Farm*, *supra*, 114 Cal.App.4th at pp. 446-449.)

In *State Farm*, for example, the Court of Appeal concluded the internal affairs doctrine required it to apply Illinois law to a nationwide shareholder class action alleging an Illinois insurance corporation failed to pay its shareholders dividends required by the shareholders' policies. (*State Farm, supra*, 114 Cal.App.4th at pp. 438-439.) Even though the shareholders described their claims as simple causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing, the *State Farm* court concluded those claims involved internal corporate affairs peculiar to the relationship between the corporation and its shareholders because the corporation's bylaws and other documents granted the corporation's board of directors discretion to decide whether to declare a dividend. Indeed, the decision whether to declare a dividend was a quintessential internal affair affecting only the corporation and its shareholders. Allowing courts to apply the law of states other than the state of incorporation therefore

22

could lead to holders of the same class of shares having different rights to receive dividends.  (*Id*. at pp. 446-447.)

In contrast, the *Friese* court concluded the internal affairs doctrine did not prevent it from applying California law to a foreign corporation's insider trading claims against former directors and officers under a California statute that authorized the corporation to recover treble profits.  The court explained the internal affairs doctrine did not prevent states other than the state of incorporation from regulating the sale of securities because such laws are part of a broader public policy to protect investors in general and do not interfere with a corporation's internal affairs.  (*Friese*, *supra*, 134 Cal.App.4th at pp. 707-710.)  Indeed, holding a former director and officer liable to a corporation for insider trading does not subject the corporation to inconsistent obligations and applying different state laws to different transactions does not undermine the policies supporting the internal affairs doctrine.  (Id. at p. 707-708; see Rest.2d Conf. of Laws, § 309, com. c, pp. 333-334.)

Similarly, in *Lidow*, the Court of Appeal concluded the internal affairs doctrine did not prevent application of California law to a claim for wrongful termination in violation of public policy alleged by a foreign corporation's CEO.  Although a corporation's decision to remove its CEO typically involves the corporation's internal governance and triggers the internal affairs doctrine, the *Lidow* court concluded the CEO's allegations that he was removed for complaining about illegal and unethical activities went beyond internal governance and touched upon broader public interest concerns.  Moreover, applying California law would not subject the corporation to conflicting demands or affect its organic structure.  (*Lidow*, *supra*, 206 Cal.App.4th at p. 362.)

23

2. The Internal Affairs Doctrine Did Not Override the Employment Contract's Choice-of-Law Provision

Colaco contends the internal affairs doctrine provides the controlling conflict of laws analysis and therefore the trial court should have applied Delaware law because Cavotec was incorporated in Delaware. We conclude *Nedlloyd* provides the controlling conflict analysis based on the parties' choice-of-law clause and the trial court properly applied California law because Colaco failed to show Delaware had a materially greater interest in the determination of the particular issues he raised.

As explained, California has a strong public policy that requires its courts to enforce reasonable choice-of-law provisions unless the party opposing enforcement shows a state other than the one the parties designated has a materially greater interest in the particular issues involved. (*Washington Mutual*, *supra*, 24 Cal.4th at p. 917; *Nedlloyd*, *supra*, 3 Cal.4th at pp. 462, 464-465.) The internal affairs doctrine and the policies underlying it must be considered in determining whether a state other than the one the parties selected has a materially greater interest (see *Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1107), but to simply apply the internal affairs doctrine without considering the parties' choice-of-law provision would ignore the strong public policy our Supreme Court has declared in favor of the enforcing choice-of-law provisions.

Here, the Employment Contract provides that California law shall govern all of Colaco's and Cavotec's rights and liabilities.[8] There is no dispute Colaco, Cavotec, and Colaco's employment with Cavotec had a substantial relationship with California and a reasonable basis existed for designating California law to govern their rights and

---

[8] The APA also included a choice-of-law provision designating California law: "This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of the State of California, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of California." As stated above, Colaco was a signatory to the APA, but his obligations under the APA were limited.

24

liabilities.  Indeed, before Cavotec purchased Inet's assets, Inet was based in Orange County, California and Colaco worked out of Inet's offices and facilities in Orange County.  Upon selling Inet's assets to Cavotec, Colaco entered into the Employment Contract and agreed to work primarily from the offices and facilities in Orange County.

Under *Nedlloyd*, the burden therefore shifted to Colaco to identify a fundamental conflict between California and Delaware law and show that Delaware had a materially greater interest in the determination of the particular issues involved. (*Washington Mutual*, *supra*, 24 Cal.4th at p. 917; *Nedlloyd*, *supra*, 3 Cal.4th at p. 466.) The particular issues Colaco raised are (1) whether Cavotec could recover punitive damages on a breach of fiduciary duty claim and (2) whether Cavotec's claim against Inet for breach of the APA barred Cavotec's claim against Colaco for breach of fiduciary duty.

Colaco failed to identify in the trial court, and does not identify on appeal, a fundamental Delaware policy regarding these issues, nor does he explain how Delaware has a materially greater interest in the determination of these particular issues.  Instead, he simply argues the internal affairs doctrine overrides the parties' choice-of-law provision because it establishes a bright-line rule that dictates the governing law in all cases involving internal corporate affairs, and all issues concerning a corporate officer's fiduciary duties are internal corporate affairs.  We do not share Colaco's simplistic view of the issue.

Colaco fails to cite any California authorities to support his contention, and our independent research has uncovered no California decision resolving a conflict between a choice-of-law provision and the internal affairs doctrine.  Colaco cites several foreign cases, but they fail to persuade us.  One of Colaco's cases actually applied California law to conclude a choice-of-law provision prevailed over the internal affairs doctrine, several other cases do not reach the conclusion Colaco suggests, and the two that concluded the internal affairs doctrine prevailed over a choice-of-law clause are

25

readily distinguishable.  (See *Johnson v. Myers* (N.D.Cal. 2011) 2011 U.S. Dist. Lexis 112897 (*Johnson*); *Heine v. Steamline Foods, Inc.* (N.D.Ohio 2011) 805 F.Supp.2d 383 (*Heine*); *Clark v. Kelly* (Del.Ch. 1999) 1999 Del. Ch. Lexis 148 (*Clark*); *BBS Norwalk One, Inc. v. Raccolta, Inc.* (S.D.N.Y. 1999) 60 F.Supp.2d 123 (*BBS Norwalk*); *Rosenmiller v. Bordes* (Del. Ch. 1991) 607 A.2d 465 (*Rosenmiller*); *Bagdon v. Bridgestone/Firestone, Inc.* (7th Cir. 1990) 916 F.2d 379 (*Bagdon*).)

In *Johnson*, a federal district court applied California law to conclude the parties' choice-of-law clause took precedence over the internal affairs doctrine on the plaintiff's claim for breach of a stock purchase agreement.  The court reasoned California's strong public policy favoring enforcement of choice-of-law clauses and its unwillingness to reflexively apply the internal affairs doctrine required that result. (*Johnson*, *supra*, 2011 U.S. Dist Lexis 112897, *26-*28.)  Colaco focuses on the *Johnson* court's decision to apply Great Britain's law to the plaintiff's tort claims, but the court in reaching that decision did not determine the internal affairs doctrine overrode the parties' choice of law.  Rather, the court simply applied the internal affairs doctrine without considering the parties' choice-of-law clause because the clause's language was not broad enough to apply to the plaintiff's tort claims.  (*Id.* at pp. *25-*27.)

In *Bagdon*, the Seventh Circuit applied the internal affairs doctrine to determine the controlling law instead of a choice-of-law clause in the parties' agreement because it concluded the parties waived the choice-of-law clause by failing to argue or brief whether it applied, not because the internal affairs doctrine overrode the parties' choice-of-law clause.  To the contrary, the *Bagdon* court explained in dicta that it was inclined to conclude the choice-of-law clause controlled if the parties had not waived the issue because the agreement addressed the employment terms for one of the parties and each parties' ownership interest in the corporation, but it "d[id] not speak to corporate governance."  (*Bagdon*, *supra*, 916 F.2d at p. 383.)

26

In *Clark*, the court applied the internal affairs doctrine to determine the controlling law, but it did not conclude the doctrine superseded the choice-of-law clause in the parties' contract. Rather, the court concluded the clause did not apply to the particular issue. (*Clark*, *supra*, 1999 Del. Ch. Lexis 148, *12-*15.) *Clark* involved a dispute regarding whether a member of a Delaware limited liability company had transferred its ownership interest and thereby surrendered control under the company's operating agreement. The member was a closely held California corporation and the issue turned on whether the stock in that corporation was community property. (*Id*. at pp. *2-*9.) Although the limited liability company's operating agreement designated Delaware law as controlling, the court relied on the internal affairs doctrine and applied California law to determine whether the shares in the closely held corporation were community property because the corporation was a California corporation and its affairs were not controlled by the operating agreement for the Delaware limited liability company. (*Id*. at pp.*12-*15; see *BBS Norwalk*, *supra*, 60 F.Supp.2d at p. 129 [court applied internal affairs doctrine to determine controlling law because parties' choice of law provision did not apply to claims at issue])

*Rosenmiller* and *Heine* are the only cases Colaco cites in which the courts actually concluded the internal affair doctrine overrode an otherwise applicable choice-of-law provision. Those cases, however, are readily distinguishable. In *Rosenmiller*, the issue was the validity of a stockholder voting agreement that included a choice-of-law provision. (*Rosenmiller*, *supra*, 607 A.2d at p. 466.) Applying the Restatement analysis our Supreme Court adopted in *Nedlloyd*, the *Rosenmiller* court concluded the corporation's state of incorporation had a paramount interest in applying its laws to disputes regarding internal corporate governance, and "[n]othing is more central to the internal management of a corporation than a stockholder's right to vote in the election of its directors." (*Rosenmiller*, at pp. 467-468.)

27

*Heine* involved a minority shareholder's breach of fiduciary duty claims against a corporation and its majority shareholder for allegedly making unauthorized transfers to another entity the majority shareholder owned. (*Heine*, *supra*, 805 F.Supp.2d at p. 387.) The federal district court applied the internal affairs doctrine instead of the parties' choice-of-law clause to determine the governing law, but the court failed to conduct the analysis required by *Nedlloyd*. Instead, the court simply cited two other cases that reached the same result without conducting any analysis of the conflicting state interests. Moreover, similar to *Rosenmiller*, the two cited cases involved quintessential internal governance issues—whether a corporation had the required surplus to redeem stock and a claim for dissolution. (*Heine*, at pp. 390-391.)

Here, the particular issues Colaco raised do not involve whether he owed Cavotec a particular duty or the scope of the fiduciary duties he owed as an officer of Cavotec. Colaco also does not suggest California and Delaware law conflict on the duties he owed. The two issues Colaco raised solely concern the remedies available to Cavotec for Colaco's breach of duty.

Applying California law to these issues will not alter the duties Colaco owed as an officer nor will it subject Cavotec's officers to different duties. Cavotec will not be subjected to conflicting demands if California law is applied, its organic structure will not be affected, and its shareholders' rights will not be altered. Rather, applying California law on these issues will promote certainty and predictability because Colaco and Cavotec agreed in a freely negotiated agreement that California law would govern all of their rights and liabilities. Colaco fails to explain how the internal affairs doctrine overrides the parties' choice-of-law clause on these issues or why it allows him to avoid application of the law to which he agreed. Applying Delaware law based on the internal affairs doctrine would undermine the certainty and predictability the parties sought by including a choice-of-law provision in their agreement. We therefore conclude the trial court did not err in applying California law.

28

Finally, Colaco contends Corporations Code section 2116 (section 2116) required the trial court to apply Delaware law. According to Colaco, that statute codifies the internal affairs doctrine and "mandate[s] that claims for 'violation of official duty' by executives of foreign corporations are to be governed by 'applicable laws of the state or place of incorporation whether committed or done in this state or elsewhere.'" Colaco overstates section 2116's import and we conclude that statute does not govern in this case.

Section 2116 only partially codifies the internal affairs doctrine and does not mandate applying the law of the incorporating state to all misconduct claims against the corporation's "executives." (See Friedman et al., Cal. Practice Guide: Corporations (The Rutter Group 2017) ¶ 3:4.3, pp. 3-2 to 3-3.) For example, in *Friese*, the Court of Appeal concluded section 2116 did not prohibit application of California law to a foreign corporation's insider trading claim against its former directors because the claims did not interfere with internal corporate affairs. (*Friese*, *supra*, 134 Cal.App.4th at pp. 706-709.) More importantly, section 2116's plain language only applies to claims against a corporation's directors, not to claims against a corporation's officers.[9] Colaco cites no authority that would allow us to read the term officer into the statute. (Code Civ. Proc. § 1858 ["In the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted"]; *People v. Guzman* (2005) 35 Cal.4th 577, 587 ["'insert[ing]' additional language into a statute 'violate[s] the

_____

[9] Section 2116 states, "The *directors* of a foreign corporation transacting intrastate business are liable to the corporation, its shareholders, creditors, receiver, liquidator or trustee in bankruptcy for the making of unauthorized dividends, purchase of shares or distribution of assets or false certificates, reports or public notices or other violation of official duty according to any applicable laws of the state or place of incorporation or organization, whether committed or done in this state or elsewhere. Such liability may be enforced in the courts of this state." (Italics added.)

cardinal rule of statutory construction that courts must not add provisions to statutes'"].) The Legislature's omission of officers from section 2116 appears consistent with the Legislature's determination to define directors' duties by statute, but to leave an officer's duties to the common law and the corporation's bylaws and resolutions. (See Friedman et al., Cal. Practice Guide: Corporations (The Rutter Group 2017) ¶ 6:281, p. 6-92 ["Although it seems clear that corporate officers owe duties of care to the corporation, there is no statute prescribing what duty is owed, as there is with corporate directors"], ¶ 6:281.2, p. 6-92 ["In the absence of statute, the degree of care turns on the officer's particular responsibilities in connection with the transaction in question"].)

Our conclusion that section 2116 did not require the trial court to apply Delaware law to the claims against Colaco should not be interpreted as a conclusion the internal affairs doctrine never applies to claims against corporate officers. Rather, we simply conclude section 2116 did not apply to the claims against Colaco as a Cavotec officer. On appropriate facts, the common law internal affairs doctrine may determine which law applies to claims against a corporate officer, but as explained above, the common law doctrine did not override the parties choice-of-law provision in this case.

C.    *Barry Failed to Show Prejudicial Error in Applying California Law*

Barry also contends the internal affairs doctrine required the trial court to apply Delaware law to the claims against her. Like Colaco, she contends Cavotec's breach of fiduciary duty and punitive damage claim against her fail as a matter of Delaware law. We again disagree.

Barry is not in the same position as Colaco. Although she also was a Cavotec officer, unlike Colaco she did not have an employment contract with Cavotec and she never agreed California law would govern her rights and liabilities. But we need not decide whether the internal affairs doctrine required the trial court to apply Delaware law to the claims against Barry because the result is the same under both California and

30

Delaware law, and therefore Barry failed to show she suffered any prejudice in the trial court's selection of the governing law.

Even when a trial court errs, we may reverse its judgment only if the error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13 ["No judgment shall be set aside, or new trial granted, . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice"]; Code Civ. Proc. § 475.) "'[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.) "'[A] "probability" in this context does not mean more likely than not, but merely *a reasonable chance*, more than an *abstract possibility*.'" (*Ibid*.)

Barry contends Cavotec's breach of fiduciary duty claim fails as a matter of law because "Delaware law requires a party to proceed by way of a breach of contract cause of action where, as here, a contract defines the very obligations that a party allegedly breached in his or her fiduciary capacity." Relying on Delaware cases, Barry contends we must reverse the jury's fiduciary duty finding because the jury awarded the same $1.313 million in damages on Cavotec's claim against Inet for breach of the APA and Cavotec's breach of fiduciary duty claim against Barry. (See *Nemec v. Shrader* (Del. 2010) 991 A.2d 1120, 1129 (*Nemec*); *Renco Group, Inc. v. MacAndrews AMG Holdings LLC* (Del.Ch. 2015) 2015 Del. Ch. Lexis 25, *24-*25 (*Renco*).) We disagree because we do not read these Delaware cases as broadly as Barry.

Under Delaware law, "[i]t is a well-settled principle that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim. In that specific context, any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as

31

superfluous." (*Nemec*, *supra*, 991 A.2d at p. 1129; see *Lee v. Pincus* (Del.Ch. 2014) 2014 Del. Ch. Lexis 229, *25 (*Lee*) ["Under *Nemec*, a contract must 'expressly' address an issue, and thereby create a right that is 'solely a creature of contract,' for the contract to preempt the default fiduciary relationship between directors and stockholders"].)

Delaware law nonetheless permits a fiduciary duty claim where "there exists an independent basis for the fiduciary duty claims apart from the contractual claims, even if both are related to the same or similar conduct." (*PT China LLC v. PT Korea LLC* (Del.Ch. 2010) 2010 Del. Ch. Lexis 38, *26 (*PT China*); see *Renco*, *supra*, 2015 Del. Ch. Lexis 25, *24-*25.) "The issue is whether the duty sought to be enforced arises out of the parties' contractual, as opposed to their fiduciary, relationship." (*Gale v. Bershad* (Del. Ch. 1998) 1998 Del. Ch. Lexis 37, *20.)

In *Nemec*, the plaintiff was a retired officer of a corporation who held corporate shares he received under the corporation's stock plan. That plan granted the corporation the right to redeem a retired officer's shares at any time. Shortly before the corporation completed a corporate spin-off that significantly increased the value of its stock, the corporation's directors voted to redeem the plaintiff's shares. The plaintiff sued the corporation for breach of the stock plan and the directors for breach of fiduciary duty, alleging the directors violated their duty of loyalty by redeeming the plaintiff's shares before the spin-off closed because it allowed the directors to receive a greater percentage of the profit from the transaction. The trial court dismissed the plaintiff's fiduciary duty claim for failing to allege sufficient facts to state a cause of action. (*Nemec*, *supra*, 991 A.2d at pp. 1122-1125.)

Based on the primacy of contract doctrine, the Delaware Supreme Court affirmed. Although the directors caused the corporation to redeem the plaintiff's shares before the spinoff, the court concluded the plaintiff based his breach of fiduciary duty claim on the corporation's exercise of its contractual right to redeem the shares at any time and therefore was barred by the breach of contract claim: "[The right to redeem the

plaintiff's shares] was not one that attached to or devolved upon all the Company's common shares generally, irrespective of a contract. Rather, that right was solely a creature of contract, and attached only to those shares that retired stockholders acquired under the Stock Plan. As a consequence, the nature and scope of the Directors' duties when causing the Company to exercise its right to redeem shares covered by the Stock Plan were intended to be defined solely by reference to that contract. Any separate fiduciary duty claims that might arise out of the Company's exercise of its contract right, therefore, were foreclosed." (*Nemec*, *supra*, 991 A.2d at p. 1129, fn. omitted.)

Similarly, the *Renco* court concluded the plaintiff's breach of contract claim barred its breach of fiduciary duty claim because the alleged misconduct violated specific rights and obligations created by the operating agreement the plaintiff and defendant entered into as members of a limited liability company. The court explained, "the Holdco Agreement provisions supersede the fiduciary duties that otherwise might apply to the conduct challenged here. The Holdco Members chose to govern their relationship with a complex, negotiated agreement. If Defendants have violated any of Plaintiff's rights, the Holdco Members' agreement—not some general duty of loyalty or care—governs the remedy to which Plaintiff is entitled." (*Renco*, *supra*, 2015 Del. Ch. Lexis 25, *27.)

In contrast, the *Lee* court concluded a breach of contract claim did not foreclose a breach of fiduciary duty claim based on the directors' general duty of loyalty even though the directors' actions affected the plaintiff shareholders' contractual rights. (*Lee*, *supra*, 2014 Del. Ch. Lexis 229, *28.) In *Lee*, the corporation had lockup agreements with its shareholders that prohibited them from selling their shares for a designated period following the corporation's initial public offering. Shortly after the offering, the directors voted to modify the lockup restrictions to allow certain shareholder groups to sell their shares before others. These modifications allowed some of the directors to sell their shares before many of the other shareholders and at a significantly higher price. The plaintiff shareholders sued the directors for breach of fiduciary duty,

33

alleging the modifications breached the duty of loyalty the directors owed to all the corporation's shareholders because it allowed them to sell their shares at a higher price while other shareholders were bound by the original lockup agreement. (*Id.* at pp. *1-*4, *7-*14.)

The *Lee* court concluded the primacy of contract doctrine did not bar the plaintiff's breach of fiduciary duty claim because the claim was based on the general fiduciary duties the directors owed to all shareholders, not the exercise of any specific contractual right: "[T]he fact that the [plaintiffs'] shares were governed by contracts containing lockup restrictions does not eliminate the fiduciary duties of the Director Defendants to act loyally to all Zynga stockholders—especially when the challenged action did not involve the exercise of any contractual right governing [the plaintiffs'] shares but instead involved modifications to the contractual provisions governing their own shares." (*Lee*, *supra*, 2014 Del. Ch. Lexis 229, *28; see *PT China*, *supra*, 2010 Del. Ch. Lexis 38, *25-*26, *31-*32 [although limited liability company's operating agreement expressly restricted its members' ability to engage in related business endeavors, primacy of contract doctrine did not bar one member's claim for breach of fiduciary duty against another for usurping company's business opportunities because claim "inherently" arose from member's common law duty of loyalty, not its contractual obligations].)

Here, we conclude Delaware's primacy of contract doctrine does not bar Cavotec's breach of fiduciary duty claim against Barry. The APA did not expressly grant Inet the right to withhold from Cavotec any payment Inet received from customers after the closing. Unlike in *Nemec*, Inet had no discretion to determine when or whether to turn over payments it received from customers, and therefore Barry did not cause Inet to exercise any contractual right it had. More importantly, Cavotec sued Barry for breaching duties she owed as a Cavotec officer, not as an Inet officer. Whether she

34

caused Inet to exercise a contractual right it purportedly had therefore is irrelevant to whether she breached her fiduciary duties to Cavotec.

Similarly, an independent basis for the breach of fiduciary duty claim existed apart from any contractual claim under the APA. The jury found Inet liable for breach of the APA because Inet failed to pay Cavotec the customer payments it received on Cavotec's behalf. The jury found Barry liable because she breached the general fiduciary duties she owed as a Cavotec officer. Substantial evidence supports the finding that Barry not only caused Inet to withhold payments to Cavotec, but she also backdated invoices and created other false invoices to conceal Inet's failure to make the required payments. The jury also found that Barry converted $20,000 of Cavotec's funds to her personal use. These actions go well beyond causing Inet not to turn over all the payments it received and nothing in the APA or any other contract modified or limited the duties Barry owed as a Cavotec officer.

Barry contends Cavotec's claim against Inet for breach of the APA barred its claim against Barry for breach of fiduciary duty because the jury awarded the identical damages on both claims. The breach of distinct duties, however, may cause the same damages (see *Cleveland v. Johnson* (2012) 209 Cal.App.4th 1315, 1344-1345), and Barry cites no authority holding that a claim is foreclosed merely because the damages on the claim are identical to the damages on another claim.

Finally, Barry contends Delaware law barred Cavotec's punitive damages claim against her because Delaware does not allow punitive damages on a breach of fiduciary duty claim. Assuming the trial court erred in applying California law on punitive damages, Barry suffered no prejudice because the jury did not award any punitive damages against her.

35

D.    *The APA's Limits on Liability Did Not Apply to Cavotec's Claims Against Colaco*

    1.    The APA's Exclusive Remedy Provision Did Not Bar Cavotec's Claim Against Colaco for Breach of the Employment Contract

Colaco contends we must reverse the jury's damage award for breaching his Employment Contract because the jury awarded Cavotec the same damages on the claim against Inet for breaching of the APA. Colaco asserts that result is barred by the APA's exclusive remedy provision and its integration clause. We disagree with Colaco's interpretation of both the jury's verdict and the APA.

The interpretation of a jury's verdict is a question of law we review de novo. (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325; *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 678.) Similarly, interpretation of a contract is a question of law we review de novo when, as here, the parties offer no extrinsic evidence on the contract's meaning. (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955 (*Founding Members*).)

In interpreting a contract, our basic goal "is to give effect to the parties' mutual intent at the time of contracting. [Citations.] When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible. [Citation.] 'The words of a contract are to be understood in their ordinary and popular sense.'" (*Founding Members*, *supra*, 109 Cal.App.4th at p. 955.) "If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs." (*Service Employees Internat. Union, Local 99 v. Options-A Child Care & Human Services Agency* (2011) 200 Cal.App.4th 869, 879.)

Colaco's argument assumes the jury held him liable for Inet's breach of the APA simply because the jury awarded the same amount of damages on the claims for breach of the APA and breach of the Employment Contract, and those damages represent the amount of customer payments Inet failed to turn over to Cavotec under the APA.

36

Although the jury awarded the same damages for breaching the two contracts, we may not conclude the jury held Colaco responsible for Inet's breach of the APA. Rather, the verdict means nothing more than the jury found Colaco's breach of the Employment Contract resulted in the same damages as Inet's breach of the APA.

In awarding damages against Inet, the jury determined Inet breached its obligations under the APA to turn over the customer payments it received for work performed and products delivered after the closing. The jury awarded damages against Colaco because it determined he breached his obligation under the Employment Contract to devote his best efforts to Cavotec's business and operations. Substantial evidence supports a jury finding that Colaco breached that obligation by causing Inet to withhold payments Cavotec otherwise was due under the APA and by concealing that conduct through the submission of backdated and other false invoices. Although they may be related, Inet's obligations under the APA are separate from Colaco's obligations under the Employment Contract. The breach of these separate obligations by two distinct parties gave rise to separate causes of action. Colaco cites no authority excusing his breach of the Employment Contract merely because that breach caused Inet to breach the APA.

To support his contrary conclusion, Colaco points to the exclusive remedy provision of article 7 in the APA, which defines the parties' obligations to indemnify one another for losses relating to the APA, the limits of those obligations, and the procedures for seeking indemnification. Section 7.2(a) defines Inet's obligation to indemnify Cavotec for losses caused by Inet's breach of any representation, warranty, covenant, or agreement Inet made in the APA "or in connection with the transactions contemplated [by the APA]." Section 7.2(b) defines Colaco's obligation to indemnify Cavotec, but that obligation is narrower than Inet's because section 7.2(b) simply requires Colaco to indemnify Cavotec for losses caused by Colaco's breach of any representation, warranty,

37

covenant, or agreement he made in the APA. Section 7.2(b) does not extend Colaco's indemnification obligations more broadly to the transactions contemplated by the APA.

Section 7.9 sets forth the exclusive remedy provision on which Colaco relies. That section provides, "The indemnification provisions of this Article 7 are the sole and exclusive remedy following the Closing for any breaches or alleged breaches of any representation, warranty or other provision of this Agreement or the transactions contemplated hereby." Cavotec, however, did not sue Colaco for breaching any of the representations, warranties, or promises he made in the APA. Rather, it sued him for separately breaching the promises he made in his Employment Contract. Moreover, as stated above, Colaco's indemnification obligations under the APA extend only to *his* breach of the representations, warranties, or promises he made in that agreement; those obligations do not extend more broadly to *all* transactions contemplated by the APA. Colaco fails to explain how the APA's indemnity provisions provide the exclusive remedy for breach of an obligation that is not subject to the indemnity provisions. We therefore do not interpret the exclusive remedy provision to apply to Cavotec's claim Colaco separately breached his Employment Contract.

Finally, based on the APA's integration clause,[10] Colaco argues the APA supersedes the Employment Agreement and all other contemporaneous agreements addressing the same subject matter as the APA, and therefore prevents Cavotec from using any obligations he assumed under the Employment Contract to hold him liable for Inet's breach of the APA. We do not interpret the APA in the same manner.

---

[10]  Section 8.5 of the APA states, "This Agreement, together with the Disclosure Schedules and the exhibits and schedules hereto, constitutes the entire agreement among the parties with respect to its subject matter and supersedes all prior or contemporaneous agreements, understandings and negotiations, both written and oral, among the parties with respect to such subject matter."

38

All parties acknowledge the Employment Agreement is a contemporaneous agreement that was entered into as part of the larger transaction contemplated by the APA. As such, we interpret the APA together with the Employment Contract. Although the APA includes an integration clause, it makes little sense to view the APA as superseding the contemporaneously created Employment Contract. Adopting Colaco's argument would mean the parties intended the APA to render the simultaneously created Employment Contract superfluous, an odd result because there would have been no reason to create the Employment Contract at all. (Civ. Code, § 1642 ["Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together"]; *R.W.L. Enterprises v. Oldcastle, Inc.* (2017) 17 Cal.App.5th 1019, 1031 ["courts have construed together *contemporaneously* executed writings under Civil Code section 1642 even if one of the writings contains an integration clause"]; *Hilb, Rogal & Hamilton Ins. Services v. Robb* (1995) 33 Cal.App.4th 1812, 1826 & fns. 10 & 11 [construing corporate merger agreement containing integration clause with employment agreement where the two were drafted contemporaneously and cross-referenced each other].)

The APA and the Employment Contract present no difficulty when interpreted together: the APA governed the terms of Cavotec's purchase of Inet's assets and the Employment Contract governed the terms of Colaco's employment with Cavotec. The APA recognized that Colaco would work for Cavotec after the closing, but it did not establish any terms or conditions for that employment. Instead, the terms and conditions for Colaco's employment were set forth in the Employment Agreement, and those terms included his obligation to devote his best efforts to Cavotec's business and operations.

2.      The APA Did Not Prevent a Punitive Damages Award Against Colaco

Colaco also contends the APA included a punitive damages waiver that prevented the jury from awarding punitive damages against him on Cavotec's breach of fiduciary duty claim. He is mistaken.

Section 7.3 of the APA provides, "Notwithstanding anything herein to the contrary, neither [Inet], Colaco, [nor Cavotec] shall have any liability *under this Agreement* for, and Losses shall not include, any punitive, special, consequential, indirect or incidental damages, unless paid pursuant to a Third Party Claim." (Italics added.)

The italicized language limits the punitive damages waiver to liabilities under the APA. As explained above, Colaco's liability to Cavotec does not arise under the APA, but rather the common law fiduciary duties he owed as an officer of Cavotec and the Employment Contract. Cavotec raised this waiver limitation in its responding brief, and Colaco's reply fails to explain why this limitation does not apply.

E.      *The Effect of Granting JNOV on the Existing Judgment*

As we have explained, Cavotec remained liable to Inet for the second $2 million payment owed under the APA, despite Inet's failure to fully perform its obligations under that agreement.[11] Thus, Inet is entitled to recover on its complaint for

_____

[11]      In its supplemental brief, Cavotec argues the $2 million payment would have been owed to Colaco, rather than Inet, under the terms of the APA because Inet, Inc. was dissolved. However, the parties have made no significant effort to distinguish between Inet Inc. and Inet LLC throughout this litigation, and the latter has been treated as Inet Inc.'s successor in interest. We conclude Cavotec has waived any right to claim otherwise on appeal.

But even if the claim were not waived, we would not find it persuasive. Because Colaco is jointly and severally liable with Inet (and Barry) for the $1.313 million in compensatory damages awarded to Cavotec, the distinction between Inet and Colaco is immaterial for purposes of analyzing the effect of Cavotec's liability as an offset against that compensatory award.

We recognize Cavotec's overarching point is somewhat different, however. It contends that if Colaco, rather than Inet, were recognized as the proper recipient of the $2 million payment, then the offset attributable to that obligation would most appropriately be applied against Colaco's punitive damage award – the award for which

40

Cavotec's failure to make that payment, and the trial court erred by denying Inet's motion for JNOV to account for Cavotec's liability.

We asked the parties to provide us with supplemental briefing, addressing how the offset of Cavotec's liability against the amounts awarded to it in the judgment would affect the judgment in relation to each of them. Having considered their arguments, we conclude the trial court should enter a new judgment in favor of Inet and against Cavotec for $687,000 in compensatory damages on the complaint; in favor of Cavotec and against Colaco for $2 million in punitive damages on Cavotec's cross-complaint; and in favor of Cavotec and against Barry on Cavotec's cross-complaint.

We begin with the basic proposition that "[t]he offset is the equivalent of payment." (*Margott v. Gem Properties, Inc., supra,* 34 Cal.App.3d. at p. 856.) Thus, the offset of Inet's right to recover $2 million from Cavotec on the complaint against

---

he is *solely* liable – thus leaving intact Cavotec's judgment against all three cross-defendants, jointly and severally, for compensatory damages. We do not find this argument persuasive.

First, as a matter of procedure, the offsetting compensatory damage claims should have been fully resolved, and thus any offset applied, as part of the trial's *liability* phase – before any award of punitive damages had been made. And second, as a matter of policy, compensatory damage awards within a case should first be offset against each other, rather than against any punitive damage award, because the former are dischargeable in a bankruptcy, while the latter would not be. It would undermine the rule of nondischargeability, and operate as a windfall, if a party could satisfy its punitive damage liability by offsetting a compensatory award in the same case, while preserving that defendant's own compensatory liability, which then could be discharged.

And finally, in the absence of such overriding considerations that determine how offsetting awards would be applied within a case, the rule would be that if Colaco were the party entitled to claim the offset, it is he who would decide. "Offset is expressed as a right of the judgment debtor. [Citations.] Since it is his right, the judgment debtor may elect to exercise or to refrain from exercising it. Where he has several rights of offset, the judgment debtor may similarly elect which of them to exercise in a particular action." (*Margott v. Gem Properties, Inc.* (1973) 34 Cal.App.3d. 849, 855 [discussing the right in the context of a defendant's right to rely on a separate judgment against the plaintiff as an offset to the liability established in the case] .)

41

Cavotec's right to recover $1.313 million against Inet on the cross-complaint effectively pays Inet's liability in full, and leaves Cavotec owing Inet a net amount of $687,000 on the complaint.

Moreover, Inet's effective payment of the compensatory damages owed to Cavotec also relieved Colaco and Barry of their joint and several liability for those same damages: "[I]t has long been recognized that if one tortfeasor pays partial compensation to the plaintiff, the liability of other tortfeasors will be correspondingly reduced: '. . . payments by one tortfeasor on account of a harm for which he and another are each liable, diminish the amount of the claim against the other whether or not it was so agreed at the time of payment and whether the payment was made before or after judgment." (*Krusi v. Bear, Stearns & Co.* (1983) 144 Cal.App.3d 664, 673.)

Colaco claims that because the offset wipes out his liability for compensatory damages, we must also reverse the award of punitive damages imposed against him. (See *Berkely v. Dowds* (2007) 152 Cal.App.4th 518, 530 ["'[a]n award of exemplary damages must be accompanied by an award of compensatory damages"].) We disagree. As Cavotec points out, the satisfaction of a compensatory damage award by offset does not mean those damages were never *awarded*. As we have explained, it merely means the award was effectively *paid*. Hence, "'where a claimant's award of compensatory damages was completely offset, he could still receive punitive damages.'" (*Fullington v. Equilon Enterprises, Inc*. (2012) 210 Cal.App.4th 667, 686-687 (*Fullington*); see *Esparza v. Specht* (1976) 55 Cal.App.3d 1, 9 (*Esparza*).)

Colaco's attempt to distinguish *Fullington* and *Esparza* is unpersuasive. He argues those cases involve an offset between two distinct claims, but the offset here is an "internal" adjustment within "the breach of contract claim," and therefore the claim "fails for lack of harm." (Italics and underlining omitted.) But these offsetting liabilities do not arise within a single breach of contract claim – they arise out of entirely separate breaches of contract by opposing parties, each of which gave rise to a distinct harm.

42

Indeed, it is that conclusion which lies at the heart of our determination that Inet's breach of the APA did not excuse Cavotec's payment obligation under that same contract.

We also reject Colaco's suggestion that we should remand the punitive damages award for reconsideration in light of the offset determination. In support, Colaco relies on *Krusi v. Bear, Stearns & Co., supra*, 144 Cal.App.3d at p. 681. There, the court remanded a punitive damage award for reconsideration following its determination that offsets should have reduced the compensatory award. But the offsets were attributable to payments from unrelated third parties, not involved in the lawsuit, which had the effect of reducing the harm caused by the defendant's act of conversion. Here, by contrast, the offset was attributable to a party held jointly and severally liable with Colaco for the harm intentionally caused, and it did not reduce that harm. We can conceive of no reason why Inet's satisfaction of the joint liability shared with Colaco would reduce Colaco's culpability for his proven misconduct. Consequently, no reconsideration of the punitive damage award is warranted.

## III

### DISPOSITION

The judgment is reversed and we remand to the trial court with instructions to enter a new judgment in favor of Inet and against Cavotec for $687,000 in compensatory damages on Inet's complaint; in favor of Cavotec and against Colaco for $2 million in punitive damages on Cavotec's cross-complaint; and in favor of Cavotec and against Barry on Cavotec's cross-complaint.  All parties are to bear their own costs on appeal.


ARONSON, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.

Filed 8/10/18

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| MICHAEL COLACO et al., | |
|     Plaintiffs, Cross-defendants | G052619 |
|     and Appellants, | |
|       v. | (Super. Ct. No. 30-2012-00601735) |
| CAVOTEC SA et al., | O R D E R |
|     Defendants, Cross-complainants | |
|     and Respondents. | |


Inet Airport Systems, Inc., Inet Airport Systems, LLC, and Michael Colaco have requested that our opinion, filed on July 11, 2018, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.

ARONSON, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.

45