Filed 5/2/22  Conservatorship of McDow CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| Conservatorship of the Person of LILY MCDOW. | |
| KENNEDY MCDOW, as Conservator, etc., | F082035 |
| Petitioner and Appellant, | (Super. Ct. No. 19PR-00191) |
| v. | **OPINION** |
| BETTY HARRIS, as Conservator, etc., | |
| Petitioner and Respondent. | |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Merced County.  Brian L. McCabe, Judge.

Kennedy McDow, in pro. per., for Petitioner and Appellant.

Betty Harris, in pro. per., for Petitioner and Respondent.

-ooOoo-

Kennedy McDow (Kennedy), who has been a self-represented litigant throughout these proceedings, appeals from an order appointing himself and his sister, Betty Harris

---

[*]        Before Franson, Acting P. J., Peña, J. and DeSantos, J.

(Betty), as co-conservators of the person of their mother, Lily McDow (Lily).[1] He contends the probate court erred when it denied him the right to have certain witnesses testify at the conservatorship hearing. Finding no reversible error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Procedural Events Leading to the Conservatorship Hearing*

In June 2019, Kennedy filed for conservatorship over Lily and asked to be appointed her temporary conservator of the person and the estate.[2] The probate court appointed the Merced County Public Defender's Office to represent Lily and referred the matter to the Merced County Court Investigator's Office for an investigation, report, and recommendation. The following month, the probate court granted Kennedy temporary conservatorship over Lily's person but deferred the decision on whether to grant temporary conservatorship over Lily's estate until it received more information from the court investigator and Adult Protective Services, which had been investigating Lily's financial situation. Betty subsequently filed an objection to Kennedy serving as conservator.

In September 2019, the court investigator's report and recommendation was filed. At a hearing held that month, the probate court issued orders assigning the public conservator's office as temporary conservator of the estate, suspending all other parties' authority over Lily's assets, referring the matter to the court investigator's office to

---

[1]     Lily also appealed in propria persona from the probate court's order. Although the Merced County Public Defender's Office represented Lily in the probate court, it declined to file an appellate brief on her behalf. Since Lily has not filed a brief, we treat the appeal as being solely taken by Kennedy.

[2]     The procedural history is taken from the reporter's transcript, particularly the probate court's summary of the proceedings, which it gave at the outset of the November 2020 conservatorship hearing. This is because the clerk's transcript contains only three documents relating to the hearing: (1) Kennedy's trial brief; (2) the minute order of the November 2, 2020 hearing; and (3) the order appointing the probate conservator of the person.

follow-up with Lily's doctor regarding a medical plan for her, and allowing the parties to meet with Lily's counsel regarding visitation requests and scheduling.

In October 2019, a capacity declaration completed and signed by Lily's doctor, James Reid, M.D., was filed with the court. The court investigator filed a declaration regarding his meeting with Dr. Reid. The investigator noted Lily appeared to be well taken care of by Kennedy, she had been diagnosed with mild to moderate dementia, and Dr. Reid opined Lily was able to make medical decisions for herself. That month, Betty filed a successor petition of the person and estate.

In January 2020, a court investigator filed a report and recommendation on the successor petition and the hearing was continued for the parties to review and analyze the report and recommendation.

In February 2020, the parties agreed to allow the probate court to appoint the Merced County Public Conservator's Office as the conservator of Lily's estate. The probate court set a hearing for April 2020 to review reports and information gathered by the public conservator's office, as well as information from Dr. Reid concerning whether it was in Lily's best interest to remain in her home under care of support services, and if so, what equipment and services she needed to allow her to do so. Kennedy was ordered to provide the court with any information received from Dr. Reid under seal. In May 2020, Dr. Reid completed and signed another capacity declaration, which was filed with the court.

At a September 2020 hearing, the probate court ordered the parties to file a statement of issues with the court, as well as trial briefs. Subsequently, Betty filed a statement of issues, and Kennedy, Betty, and another objector, Diane Belcher, filed trial briefs.

In his trial brief, Kennedy asked the probate court to grant him full conservatorship over Lily because he had cared for her since 2010 without any help from his sisters, Betty Harris, Diane Belcher, and Elnora Holloway (collectively, the

3.

daughters).  Kennedy explained after her first stroke, Lily went to live with Elnora and her husband in Ohio, and Lily gave him her house.  Lily, however, wanted to return to California, so he and his family cared for her since her return in 2010.  Kennedy asserted Lily executed a durable power of attorney for health care in June 2010, when she was living with Elnora, with Elnora listed as the "first choice."

Kennedy further stated in his brief that Lily had a stroke in March 2019 and after being treated at a hospital in Merced, she was transferred to a stroke unit in Carmichael.  Kennedy claimed Lily was set to return to a care center in Merced, but Diane told the discharge coordinator to find another place and she was transferred to a care center in Vallejo.  Kennedy claimed a durable power of attorney Lily signed, which gave Betty power of attorney, was invalid because a doctor subsequently determined Lily was incapacitated retroactive to a date before the power of attorney was signed.  Kennedy had Lily sign a new durable power of attorney revoking all other ones, which he video-recorded, and at Lily's request, he removed her from the group home she was living in and brought her home.  Kennedy asked the court to grant Lily's request to stay in her home and for him to care for her.

### *The Conservatorship Hearing*

A hearing was held concerning the conservatorship of the person on November 2, 2020.  The hearing, which was held via Zoom with some parties appearing in person, was attended by county counsel representing the public conservator's office; Lily and her attorney; objectors Betty, Diane, and Elnora and their attorney; and Kennedy.  The probate court took judicial notice of the case file.  The court investigator, who also was present, noted he was waiting to receive some medical records and had become aware of the existence of a video that he had not been provided with, which may show Lily being removed from a facility or concerned the signing of a new durable power of attorney.  Lily's attorney stated Lily wanted to remain in her home with her son, Kennedy.

4.

The daughters' attorney asserted the daughters had been denied unhampered access to their mother because of Kennedy's actions. The attorney explained Elnora held Lily's health care directive and living will, which gave she and Diane the power to make medical decisions. While Elnora was prepared to have Lily remain with her, Lily wanted to return to California. The attorney claimed Diane, who lives in California, helped care for Lily while she was getting adjusted because Kennedy was a truck driver who left for long periods of time. Betty held a power of attorney over Lily's finances.

The daughters' attorney stated this situation worked well until Kennedy interfered. The daughters paid for Lily's first month at a nursing facility because she needed rehabilitation after suffering a stroke, but Kennedy took her out of there without the proper authority. The attorney asserted the daughters had not had phone contact with Lily on a regular basis—until the probate court ordered once a week visits, they had zero contact with Lily because either Kennedy turned the phone off or did not ensure the bill was paid. The attorney further asserted Kennedy took Lily to the bank to withdraw large sums of money and had written checks to himself, which were attached to the daughters' brief or statement of issues, as well as to the objections to Kennedy being appointed the conservator.

The daughters' attorney stated the daughters wanted to have contact with their mother through phone calls and personal visits, and to help make medical decisions, and they had a problem with Kennedy being conservator because he was not giving them access to Lily. The attorney asserted that when Lily had her phone, she was calling her daughters and told them she wanted them to visit her, and they had phone records showing incoming calls from Lily's number to them. Kennedy, however, would not let them visit.

Kennedy testified when Lily returned to California, he and his wife took care of her without help from anyone. Kennedy stated he had two witnesses who would testify the only time the daughters "came down" was in 2018. Kennedy asserted he wrote the

5.

checks before Lily's stroke, and he did not need his mother's money. Kennedy denied preventing Lily from talking to her daughters—he claimed she talked to them when they called, and she called them. Lily's phone was shut off because the conservator's office did not pay her last bill.[3]

Kennedy claimed Lily revoked the power of attorney she gave to Betty. The video the court investigator referred to was taken when Lily was at "Dover Valley" and showed Lily signing a power of attorney and having it notarized. With respect to the bank, Lily asked him to take money out and put it into an account that was in her name. Kennedy claimed Betty mishandled Lily's finances after taking control of them and Lily was facing bankruptcy.

Kennedy did not have a problem with Lily talking to her daughters if she wanted, but he would not let Betty and her husband into the house because one time they ransacked the house and removed pictures, claiming they had the right to do so. Kennedy stated he had been taking care of Lily and if her daughters wanted to call her, that was fine, but they should not stress her out and force her to go back in a nursing home, which she did not want.

Kennedy took Lily out of the group home. He claimed over the past year she received therapy at home and then in an outpatient setting, but the therapy stopped due to the coronavirus pandemic. Kennedy said Adult Protective Services came to the house and he heard the case was being closed. Kennedy claimed Betty changed Lily's life insurance policies and even though Lily's name was not on them, she still benefited from them. Kennedy felt he was being blamed for things, but he was the only one who had

---

**3**    County counsel later explained the conservator's office could not pay the bill because it was in Kennedy's name, and because Lily and Kennedy commingled their debt, it would be inappropriate for the public conservator to pay any debt that would result in Kennedy's debt being erased out of Lily's funds.

taken care of Lily for the past 10 years. Kennedy asked the court to talk to the two witnesses that showed up and they would "explain the same thing to you as well."

After Kennedy's testimony, Lily's attorney repeated that Lily wished to remain in her residence and to maintain her son as her conservator of the person. The daughters' attorney claimed Lily expressed a different position when she spoke with her daughters and Kennedy was not around.

Betty testified she spoke with Kennedy nearly every day until Lily had the stroke. Betty, who lives in Texas, came to see Lily every year and sometimes twice a year. Betty claimed when Kennedy's wife left, she took all of Lily's furniture, which Betty paid to replace, and every time something was needed, Betty was the one who was called. Betty did not know how Kennedy could say the daughters had not had contact with Lily, as they had pictures of the three of them with Lily at her house as well as phone records.

Betty claimed they took care of Lily when she had her stroke and Kennedy got upset and blew them off when he could not take her back to Atwater. He did not want any communication and did not want to be involved in making decisions. Lily got to the point where she realized Kennedy did not care, so she "was more than happy" to give Betty the durable power of attorney, which Betty obtained because the first facility where Lily was placed would not declare her incapacitated. After that, Lily went to another facility, but Medicare was going to stop paying because she was no longer progressing. While they secured a place for Lily, they had to use her income to pay for the facility rather than to pay her unsecured debts, and Lily's funds were being depleted because Kennedy was writing himself checks or taking money out. Betty did not know how Kennedy could say he was taking care of Lily without their assistance, as Kennedy did long-haul trucking. Betty testified they made changes to Lily's policies because Lily was upset and told them to take everything.

Betty said Lily would call her. During the last call, Kennedy came into the room, asked Lily who she was calling and told her she should not be talking to "those girls"

7.

because they were going to court the following week and they were going to try to put her into a nursing home. Betty had not been able to speak with Lily since that call. As ordered by the probate court, Betty called Lily every Sunday and Kennedy was supposed to assist Lily with getting the phone to her ear, but Kennedy was never there to help facilitate the phone calls.

Elnora testified Lily lived with her in Ohio from May to September 2010. Lily had a stroke that affected her right side, but she was able to make her own decisions and carry on a conversation. The medical power of attorney was solely Lily's decision, and she chose the order of designation of agents. Elnora put the power of attorney aside until she received the call that Lily had another stroke. Elnora took Lily to physical, speech and occupational therapy three times a week; Lily was able to move around with a walker, but she could not stand up and walk independently. Lily wanted to go home, so Elnora took her there.

At that time, Kennedy was working as a trucker, and he was on the road. His minor daughter, who lived with Kennedy and Lily, stayed with Lily when he was gone. According to Elnora, Kennedy always called the daughters whenever Lily had a major medical problem and they stayed with her until she got better. Elnora testified it was not true that they did not have anything to do with Lily or did not contact her. They called and came to visit as often as they could. They all agreed Lily should stay home, but they wanted some contact with Lily and to be able to visit her.

Diane testified when Lily returned to California after her first stroke, she and a friend visited Lily on a regular basis, every two to three weeks, and would cook, clean the house, or sit and talk with Lily. Diane called Lily and talked to her to help with her speech and sent her magazines that Lily could read aloud. They visited Lily often and Lily called her on holidays or sometimes just to talk. Diane confirmed they saw Lily in 2018, and they visited her when Diane's son graduated from college the year before.

8.

Diane further testified she was there for Lily when she had her second stroke and stayed with her at the hospital, along with Kennedy's daughter.

Diane stated it was in their court documents that they wanted Lily to stay at home, but they wanted her to be able to call them and they wanted to see her. During a recent call, Lily told her she wanted to get better and walk and she wanted to come live with one of them because she was tired of being alone. Diane claimed Lily wanted to see her daughters. While Kennedy said Lily did not want to talk to them, he was court-ordered to be there when the daughters called and hand her the phone and it was up to Lily to say she did not want to talk to them, but she never did. Diane stated she hoped Kennedy "does not get his witnesses in here to lie to say that I wasn't around there, because that's … pretty bad because you shouldn't get people to lie …."

The daughters' attorney had a copy of a police report, as there had been accusations Betty ransacked the house when she went there to get some of Lily's belongings. Betty had a civil standby when she went there and had to use a locksmith to unlock the door, per her power of attorney. The officer reported Betty went into the residence with her husband, entered her mother's room, grabbed her mother's items, and after she left the residence, it was locked up. Kennedy could see them on the surveillance cameras and called the dispatcher—he was angry they were inside the house and said the residence belonged to his mother. The attorney asserted that had there been ransacking, the officer would have noted it, but he did not.

After the daughters' attorney confirmed that at an earlier hearing, she handed Kennedy an envelope containing pictures that were Lily's, Kennedy asserted they were pictures belonging to the family that came from the house. He asked the court to talk to his other two witnesses and added the court clerk was supposed to send a link to the hearing to "Loraine," but she never received it, and she wanted to testify as well. The probate court asked him about her knowledge and what she would testify to. Kennedy responded that while he acknowledged the daughters called "once in a while," they had

9.

not spent as much time with Lily as they were saying, and when Lily had the stroke, his daughter found her, gave her CPR, and called 911. The witnesses were going to testify "to the last 10 years, and basically her care, who actually came to see her, who actually talked to her, they can testify to all that."

The probate court asked him if this witness was someone who was with Lily 24 hours a day. Kennedy stated his kids "were around her all the time." The probate court stated his own kids were not home all the time and he had never met a kid who stayed in the house 24 hours and asked if his kids were going to testify that they were there all the time and could testify about every phone call that came in for Lily. Kennedy responded they would testify they were there and while he acknowledged no one was there "24/7," if he was not there, either one of his kids or his now ex-wife was there. The probate court found the testimony to be cumulative because it was "somewhat consistent" to what everyone had already said, namely, that Kennedy had been there for 10 years, but the daughters claimed they had contact with Lily through calls and visits, and it was "not a matter of percentages and keeping count," nor was it for the court "to keep tally and whoever has the most tallies wins."

The probate court asked Kennedy what he had to say about the "more damning allegations," namely, that he was an active participant in interfering with the daughters' contact with Lily, either by telephone or in person. Kennedy responded that when they return the property they took from the house, they were "more than welcome to mom," who would say the same thing. Kennedy could not understand how they could say Lily was calling them but also say he was interfering and claimed he did not care if they talked to her. His only problem was with them coming to the house and thinking they could take whatever they wanted.

The probate court asked Kennedy what his response was to the anecdote in which he was heard telling Lily not to talk to the daughters because they were going to court, and they wanted to put her into a nursing home. Kennedy insisted he was not interfering,

10.

and he only told Lily they were recording everything she said when she talked to them and sometimes, they told her about going back to a rehab center.

Lily's attorney was appreciative that the parties agreed she should remain in her home. The attorney had seen Lily express care and concern for all her children. He believed it was important for everyone if face-to-face visits at the house could occur and for Kennedy to acquiesce to visits. He added it was important for Lily to be able to have face-to-face contact, as well as phone conversations, with her daughters, and to know her children were interacting amicably. The probate court questioned Lily directly about her wishes. Lily confirmed she wanted to live at her house, and she wanted to talk to her daughters.

The probate court found it was in Lily's best interest for all the children to have frequent continuous contact with her, both telephonically and in person at the home, and it was pleased the children agreed she should remain in her home as long as possible. The probate court believed it was in Lily's interest to have the public conservator's office remain conservator over the estate.

With respect to who should be appointed conservator over the person, the probate court believed the daughters should be involved in the decisions and there should be a "collaborative approach" involving all the children. Kennedy responded that his sisters had gone too far and there was no making up between them, as they were not his sisters anymore. Lily's attorney, however, agreed it was a good idea to appoint all four siblings as co-conservators of the person, which would allow the daughters to have a better role engaging with Lily. The attorney encouraged Kennedy to move forward with the care of his mother.

The probate court noted the successor petition was filed only by Betty, who confirmed to the court she would act in consultation with her sisters. The probate court wanted to make clear to Kennedy and Betty that the four of them should be talking about their mother's care, but only Kennedy and Betty would be co-conservators of the person.

11.

Kennedy again responded that he was unwilling to deal with his sisters, he was not going to let them steal things from the house with no penalty, and if the court wanted to "give it to them," then they could take care of her and he would be "out of there by the end of the year." When the probate court explained he and Betty would be appointed co-conservators, Kennedy said to "give it to Betty" and to leave him out of it. The probate court responded that he could file the appropriate withdrawal, but it would not be in Lily's interests, and it was time he learned to work with his sisters. The next day, the probate court issued an order appointing Kennedy and Betty co-conservators of the person.

## DISCUSSION

Kennedy contends the probate court erroneously refused to allow his witnesses to testify so they could dispute allegations being made by the daughters. Kennedy asserts he had three witnesses available to testify—his daughters, Katrina and Shannon McDow, and their mother, Shirley Washington, who was his first wife. He also asserts his second wife, Laureen Winters, requested leave to testify via Zoom. Kennedy argues the probate court should have let him respond to the daughters' "multiple allegations of elder abuse and fraud," as well as their claims that they were caring for Lily, but the probate court erroneously ruled only someone who was around Lily 24 hours a day could testify.

Evidence Code section 352 grants the trial court discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time. This discretion extends to the exclusion of cumulative evidence. (*Horn v. General Motors Corp.* (1976) 17 Cal.3d 359, 371, citing Evid. Code, § 352.) We review the court's decision to exclude cumulative evidence for an abuse of discretion. (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 785; *Avant! Corp. v. Superior Court* (2000) 79 Cal.App.4th 876, 881 ["Abuse of discretion is a deferential standard of review."].)

12.

Even when a trial court errs, we may reverse its judgment only if the error resulted in a miscarriage of justice.  (Cal. Const., art. VI, § 13 ["No judgment shall be set aside, or new trial granted, … unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."]; Code Civ. Proc., § 475; *Colaco v. Cavotec SA* (2018) 25 Cal.App.5th 1172, 1196–1197.)  " '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' "  (*Cassim v. Allstate Ins. Co*. (2004) 33 Cal.4th 780, 800.)

Here, when the probate court asked Kennedy what his witnesses would testify to, Kennedy responded they would testify the daughters "haven't been down there and spend as much time with her as they're trying to tell you"; further, they would testify to Lily's care over the last 10 years and who came to see her and talk to her.  The probate court determined this testimony was cumulative because the daughters conceded Kennedy had been there for 10 years but denied they had never had contact with Lily, rather they called and visited her.  The probate court did not believe having additional testimony concerning the daughters' contact with Lily would assist it, as it was not keeping a tally of the extent of that contact.

Kennedy has not shown this ruling was an abuse of discretion.  Contrary to Kennedy's assertion, the probate court did not exclude his witnesses because they were not around Lily 24 hours a day, but rather because their testimony was cumulative.  While Kennedy asserts his witnesses' testimony would have refuted the daughters' allegations of abuse and fraud, he did not tell the probate court he was offering their testimony for that purpose.  Given that the evidence already established the daughters had contact with mother, and because the probate court considered the amount of contact to not be determinative of the issues in the case, the probate court reasonably exercised its

13.

discretion under Evidence Code section 352 to exclude the witnesses. (*Horn v. General Motors Corp.*, *supra*, 17 Cal.3d at p. 371 [" 'the exclusion of evidence which has only a cumulative effect will not justify reversal on appeal' "]; *People ex rel. Department of Public Works v. Donovan* (1962) 57 Cal.2d 346, 357 [where additional evidence is "merely cumulative … there is no abuse of discretion in disallowing it"].)

Moreover, even if the trial court erroneously excluded the witnesses, Kennedy fails to demonstrate the admission of their testimonies would have produced a more favorable result. It appears the issue in this case was not whether Lily should be subject to a conservatorship, but rather who her conservator should be. This issue was solely within the probate court's discretion and in selecting a conservator, the court was required to act in the proposed conservatee's best interests. (Prob. Code, § 1812, subd. (a) ["the selection of a conservator of the person … is solely in the discretion of the court and, in making the selection, the court is to be guided by what appears to be for the best interests of the proposed conservatee"]; cf. *Guardianship of Brown* (1976) 16 Cal.3d 326, 339.) Based on the record before us, we cannot say it is reasonably probable that the proposed witnesses' testimony would have had any tangible effect on the probate court's decision to appoint both Kennedy and Betty as co-conservators of the person.

Finally, Kennedy asserts Lily has stated she did not want Betty to care for her[4] and Betty cannot perform the duties of a conservator because she is a Texas resident. Kennedy, however, does not cite any authority to support that proposition. Under Probate Code section 1820, subdivision (a)(3), any relative of the proposed conservatee may petition for conservatorship of the person. As Lily's daughter, Betty was eligible to be appointed her conservator. Kennedy contends Betty cannot perform the duties of a

---

[4]     While Kennedy states Lily testified that she did not want to have anything to do with her daughters, Lily made that statement at the February 2020 hearing, not at the November 2020 hearing on the conservatorship petitions, and she was not testifying at the time.

14.

conservator from Texas, but he fails to explain why the duties he asserts she cannot perform, such as arranging for Lily's care and protection, as well as her personal needs, or deciding where Lily will live, cannot be performed from another state.

To the extent Kennedy is arguing the probate court abused its discretion in appointing Betty as a co-conservator, we do not have a sufficient record to review the claim. The record we have before us shows that in deciding who should be Lily's conservators, the probate court reviewed Kennedy's and Betty's petitions, and the court investigator's reports and recommendations. But Kennedy did not designate the petitions or the reports to be included in the record on appeal. Therefore, we cannot determine what information was before the probate court when it rendered its decision.

As the appellant, Kennedy must provide an adequate record on appeal. " 'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Based on the record before us, we must presume the probate court was presented with sufficient evidence to support its order. Accordingly, we affirm the order appointing Kennedy and Betty as co-conservators of the person of Lily.

## DISPOSITION

The probate court's orders are affirmed. Respondent shall recover her costs on appeal.

15.